143 So.2d 775 (1962)
Sam B. GULOTTA, Plaintiff-Appellee,
v.
Ernest L. SWINNEY, Defendant-Appellant, Amite Building & Supply Co., Inc., Intervenor-Appellee.
No. 5559.
Court of Appeal of Louisiana, First Circuit.
May 21, 1962.
*776 Pittman & Matheny by Iddo Pittman, Jr., Hammond, for appellant.
Mentz & Ford, by Leon Ford, III, Hammond, Edwin C. Schilling, Jr., Amite, for appellee.
Before ELLIS, HERGET and MILLER, JJ.
MILLER, Judge pro tem.
Sam B. Gulotta (hereinafter sometimes referred to as "Contractor") brought this suit against Ernest L. Swinney (hereinafter sometimes referred to as "Owner") to recover the balance of the final instalment on a building contract together with certain charges for extras which make up a total demand of $3,824.10, and to have recognized a labor and material lien which had been timely filed by Contractor. Owner answered the suit admitting that he had not paid $2,750.00 of the final instalment together with $54.00 due for extras ordered by Owner, but reconvened claiming that numerous named defects caused him damages, and listing other claims which if actually due would offset Contractor's claim and would entitle Owner to a judgment in his favor in the sum of $1,623.14. Owner further sought to have the liens filed by Contractor and by the Supplier cancelled and erased.
Amite Building & Supply Company, Inc., the Supplier, intervened seeking to have recognized its timely filed material lien affecting Owner's property in the amount of $2,597.29, together with an additional $10.00 for filing and recordation charges. Contractor has admitted the correctness of the account due to Intervenor and Owner has admitted the entire account except for the changes for five doors. Owner contends that the lien lists five more doors than were actually used in his house. However, the *777 record indicates that there were some doors which had to be replaced. It appears that all items claimed by Intervenor were delivered to the premises and used in the construction of the house, and the trial court's judgment allowing full recovery to Intervenor and recognizing its material lien should be affirmed.
On June 27, 1959, Owner and Contractor entered into the following contract:
 "INDEPENDENCE, LOUISIANA
 "JUNE 27, 1959
 "I DO HEREBY AGREE TO BUILD ERNEST L. SWINNEY'S HOUSE ON
 THE RIVER ROAD ACCORDING TO THE BLUEPRINTS AND SPECIFICATIONS
 FOR $15,000.00. TO BE PAID FOR IN FOUR EQUAL PAYMENTS
 OF $3,750.00 AS HOUSE IS CONSTRUCTED. FIRST PAYMENT
 DUE AFTER BASE SLAB IS COMPLETED. SECOND PAYMENT DUE
 AFTER ROOF AND OUTER WALL BOARD COMPLETED. THIRD
 PAYMENT DUE AFER INSIDE FINISHING IS COMPLETED. FOURTH
 PAYMENT DUE AFTER FINAL COMPLETION OF HOUSE. AIR CONDITIONING
 UNIT TO BE 3-TONS INSTEAD OF 2-TONS AS IN PLANS
 OF HOUSE. HOUSE TO BE COMPLETED BY 10-1-59 OR PAY $10.00
 PER DAY UNTIL COMPLETED.
 "WITNESSES:
 (s) John L. Garon (s) Sam Gulotta 
 SAM GULOTTA
 (s) Anthony Schin (s) Ernest L. Swinney 
 ERNEST L. SWINNEY
 "SWORN TO AND SUBSCRIBED IN MY PRESENCE
 THIS 27TH DAY OF JUNE 1959.
 "(s) Chas. G. Anzalone, Jr. 
 CHAS. G. ANZALONE JR.
 NOTARY PUBLIC
 PARISH OF TANGIPAHOA"
 "SEAL"
Attached to this contract were four pages of plans prepared by a draftsman, and four pages setting forth materials to be used in the house. This material list which was on a form prepared by the VA and FHA could hardly be considered "specifications" in the manner in which that term is used by architects.
So far as the record shows, prior to the execution of the contract there was no architect or attorney employed. After the execution of the contract, there was no bond required, nor was the contract recorded. There was no effort by either of the parties to have change orders prepared authorizing the different changes which they agreed to make nor to set prices or additional delays in the delivery date because of the changes. As a result we have this suit with two inconsistent lines of testimony.
Although the house was not to be financed by the FHA or VA the Contractor employed Mr. Polk Hebert, who is an experienced appraiser and inspector. The purpose of employing Mr. Hebert was to make certain that the house would be built so as to qualify for either a VA or an FHA loan should Owner desire to sell the house. In this connection, Mr. Hebert was to make four inspections. However, as it developed, he was consulted on many additional occasions by both parties concerning their various disputes during the construction of the house.
*778 The house was completed on October 31, 1959. A few days before that time Mr. Hebert made the final inspection with both parties present and in his opinion all parties, in effect, accepted the house. After Owner moved into the house, the Contractor came by to collect the final instalment and Owner made out a check for the balance which presumably both agreed to be due, but less $300.00 which Owner claimed because Contractor was 30 days late in delivering the house. Contractor refused to accept the $300.00 deduction, and thereafter filed this suit seeking the final payment of $2,750.00 together with the following extras:

Addition to driveway $ 28.00
Overhead tile in shower 10.00
Cement pipe 16.00
Difference on bath & lavatory 127.50
Addition on bookcases 46.00
Change living room to sheetrock 125.00
Plumbing extras 74.00
Electric work tie-in 85.00
Thermostat 32.60
Labor on tearing out cabinets 350.00
Extra shower door 15.00
Change in bricks 165.00

Owner answered admitting that the final payment of $2,750.00 and the charges for the first three extras listed hereinabove were due to Contractor, but contended that this was offset by the damages sustained by Owner in the following particulars set forth in Article 11 of the answer:
a. The living room door to hall is 12 inches out of place.
b. The living room entrance door is 6 inches out of place.
c. The living room what-not stand was constructed of wood rather than ornamental iron as provided in the plans and specifications.
d. The living room was sheet-rocked instead of celotex and acoustical ceiling, as provided in the plans and specifications.
e. The exterior wood was fir rather than cedar, B. grade as required in the plans and specifications.
f. The kitchen cabinet doors were constructed the wrong size.
g. The interior trim was constructed of fir rather than mahogany in several places.
h. Used pine core doors instead of a solid mahogany door as required in the plans and specifications.
i. Used folding bath door instead of a sliding glass door.
j. The closet in the reception hall is 6 inches out of place.
k. The wrong type of commodes used in two bathrooms.
l. The ventilating fans in the two bathrooms were not vented through the roof.
m. The formica is not glued to the walls of the kitchen.
n. Part of the den paneling is faulty and one can see through the inner wall to the outer wall.
o. Outer brick walls are crooked and not in plumb.
p. Kitchen cabinets are not against the wall by the sink.
q. Both utility doors are out of place 7 inches.
r. Sheetrock seams are broken in all corners in all rooms except the living room and contractor used 3/8" sheetrock rather than ½" sheetrock in living room.
s. The ceramic tile on the dressing table in one of the bathrooms is broken.
t. Omitted a 14' steel beam overhead on back porch.
For these items Owner claimed damages of $5,000.00 and in addition he claimed that *779 Contractor was indebted to him for the following items set forth in Article 13 of the answer:
a. $300.00, representing 30 days delay at $10 per day for contractor's failure to deliver the house by Oct. 1, 1959.
b. $7.50 for the gas tap.
c. $32.94 for two controls for heaters.
d. $6.70 for door, lock and hinges.
e. $80.00 for folding shower door.
The learned trial judge after offsetting various claims concluded that Contractor was entitled to judgment in the sum of $3,317.85 together with interest and costs and that Contractor's timely recorded lien and privilege should be recognized in that amount. As noted hereinabove, Supplier was also granted judgment in the amount claimed and had its lien recognized. From this judgment, Owner entered this suspensive appeal. Contractor answered the appeal asking to have the judgment increased to the sum of $3,824.10.
LSA-C.C. Article 2763 provides:
"When an architect or other workman has undertaken the building of a house by the job, according to a plot agreed on between him and the owner of the ground, he can not claim an increase of the price agreed on, on the plea of the original plot having been changed and extended, unless he can prove that such changes have been made in compliance with the wishes of the owner."
Plaintiff-appellee has cited the cases of Fossier v. Herries, 1831, 2 La. 490; Alston v. Ross, 1843, 4 Rob. 399; Percy v. Peyroux, 1843, 5 Rob. 179; Doyle v. Ryan, 1845, 9 Rob. 402; Mathias v. Lebret, 1845, 10 Rob. 94, as holding that one who contracts to build a house according to a plan, or for a fixed price, cannot claim for extra work, unless he show it was done at the proprietor's request or with his consent, express or implied; as, when the latter, daily present at the building, must have seen, and did not forbid it. In this case, we find that many of the items which Contractor seeks to classify as extras, were in fact substitutions or were simply efforts on the part of the Owner to have the house built according to the plans and material list.
Even if Owner consented to the changes, Contractor has the burden of proving that extra work and extra material was furnished and its value. Tolle v. Grahan, 1927, 5 La.App. 576; Tolle v. Mentz, 1927, 5 La.App. 607.
We will undertake to discuss each claim individually. However since Owner agrees that $2,750.00 of the final instalment and that $54.00 for the first three extras listed in Contractor's petition are due, we need not review these claims.
Contractor claims $127.50 for the difference in value between the bath & lavatory fixtures actually selected by Owner instead of those shown in the plans and material list. Owner denies that there was to be any extra charge for the change of plumbing fixtures. Owner related that Contractor's supplier could not get Crane fixtures which were specified, and therefore Contractor took Owner to another Supplier to select the fixtures. After the fixtures were selected, Owner paid for these fixtures and deducted this payment from the next quarterly instalment on the contract. Owner contends that since he has paid for the fixtures, there could be no extra charge for them. Contractor testified that he informed Owner that it would cost extra to use bigger and better fixtures, but that he didn't know how much extra. Contractor testified that Owner agreed at that time that "he would pay all extras on the job." Contractor points out that Owner withheld the full amount which Owner paid for the fixtures from the next quarterly payment, and therefore Owner can no longer claim that he has paid for the fixtures. We are *780 satisfied from the record that the trial court correctly held that Owner selected fixtures which cost Contractor $127.50 more than those called for in the material list and that under the jurisprudence heretofore cited, Owner owes Contractor for this extra.
Contractor claims $46.00 as an additional charge on bookcases. The plans and material list do not detail how the bookcases should be constructed other than by showing them to be of "ornamental iron". Owner contends that Contractor desired to change the bookcase from iron to wood whereas Contractor testified that it was Owner and his wife who desired the change. Contractor further testified that he told Owner that it would cost around $50.00 extra to change the bookcase. Owner denies this. Mr. Baker, the plumbing subcontractor, testified, on direct examination when called as a witness for the Contractor, that:
"Q. Did you hear the argument about the change from the ornamental iron to the woodwork on that bookcase?
"A. I heard part of that.
"Q. Can you state to the Court whether Mr. Swinney (Owner) agreed to make that change?
"A. Yes, he agreed to make the change from that iron to the wood.
"Q. Mr. Baker, to your personal knowledge did Mr. Swinney agree to pay for these extras?
"A. No sir, he told me definitely he was not going to pay for no extras on the house nowhere.
"Q. When the changes were made, did he agree to pay for them?
"A. You couldn't tell him you was going to make any changes, he told you to make the changes.
"Q. When he asked for a change would he agree to pay for it?
"A. No sir.
"Q. Did he ever agree to pay for any changes that you know of?
"A. Not that I know of."
Contractor testified that Merle Evans and J. D. Baker were present when Owner agreed to pay $50.00 extra for the change from iron to wood. As noted above, Baker, who was Contractor's witness, denies this. However, Mr. Evans, who was employed as a carpenter, testified that he was present when Owner agreed to pay extra for the change to build a closed bookcase, rather than open shelves and that he did not recall any figure being given as the charge for the extra. In our opinion Contractor has failed to carry the burden of proving that Owner owes extra for this change.
Contractor claims $125.00 for change of living room to sheetrock. The plans called for the living room and dining room to have celotex walls and acoustical ceiling. Owner testified that Contractor's supplier could not supply the type of celotex walls and acoustical tile which Owner desired and that the supplier suggested the change be made to sheetrock. On this occasion it is agreed by the Supplier and Owner that Owner made it clear that this change could be made only if there would be no additional charge. Supplier advised that there would be no additional charge. However, Contractor takes the position that he did not participate in this discussion, and that, so far as Contractor is concerned, the change to sheetrock was initiated by Owner. Contractor states that while the materials did not cost extra, the finishing for the sheetrock cost him an additional $125.00. The paint contractor, Mr. Wilkinson, testified that he didn't know whether the owner knew that the extra cost for finishing the living and dining rooms would be $125.00 for that arrangement was made with the Contractor alone. Mr. Wilkinson also testified that: "I did hear a little about it (change to sheetrock) one day. I heard Mr. Gulotta (Contractor) try to get Mr. Swinney (Owner) to come across and *781 give him a little more on it but I don't remember too much about it and I heard Mrs. Swinney say if it cost any moreif it cost a dime more she didn't want it." Contractor has failed to carry the burden of showing that Owner should pay extra for this change.
Contractor claims $74.00 for plumbing extras. This additional charge was for uncrating and installing an automatic washing machine and for installing a dishwasher. Mr. Baker refused to uncrate the dishwasher because Owner told him he would not pay anything additional for this service. A portion of this $74.00 was for hooking up the heating system and for furnishing additional fittings, pipe and valves for these installations. It is Owner's contention that he should not pay extra for any of these items because his floor plan shows the dishwasher, washer and heating system in place and this contract was as he styles it a "lock and key job." However, a reading of the material list shows that the dishwasher and washer are to be furnished "By owner." In the same material list under the plumbing section, it states that "Plumber to rough in for washer, dryer, dishwasher, and run Gas for heating system." At no other place in the plans or material list does it say who, if anyone, is to install, uncrate, and do anything other than rough in for these items. Contractor has proven that he is entitled to the additional $74.00.
Grouped in the charge of $74.00 for this extra was a claim by the plumber for an additional charge for using copper pipe for a short distance under the slab. The plumber testified that the material list called for galvanized pipe under the slab, whereas it plainly called for copper pipe under the slab and galvanized pipe in all other places. Neither party attempted to determine how much additional, if any, the plumber charged for this short run of copper pipe. However, from a review of the testimony concerning the extra work performed by the plumber at the insistence of Owner which was not called for in the plans or material list, it is evident that Contractor is entitled to $74.00 additional for plumbing services rendered and material furnished for Owner which were not called for in the contract.
Contractor claims $85.00 for electric work tie-in. This was for connecting the airconditioner. Contractor contends that the contract calls for running electricity to the airconditioner and not for furnishing the necessary circuit breakers and work to connect the unit. While Owner does not question that the charge of $85.00 is reasonable for the work which the electrician described, he again contends that since the plans show an airconditioner, that this contemplates that the Contractor is obligated to deliver it in operating condition. There is nothing in the plans or material list to indicate that the airconditioner is to be furnished by Owner or that the electrician is only to rough-in for the airconditioner. The electrician testified that he did not question that the airconditioner must be connected under the contract, but only took the position that the work performed by him should have been performed by the person who installed the airconditioner. Contractor has failed to prove that he is entitled to extra consideration for connecting the airconditioner.
Contractor claims an additional $32.60 for a thermostat. This seems to be the same item for which Owner claims $32.94 as item (c) of Article 13 in the Owner's claim for two controls for heaters. The testimony is vague concerning this item. Under cross-examination Owner testified:
"Q. Don't you admit that you owe $32.60 for the thermostat on it (the bathroom heater lights)?
"A. I paid for the thermostat, he owed me for the thermostat, I paid for it myself. I went to New Orleans and bought it.

*782 "Q. Didn't you charge it up to him?
"A. I charged it to him to make out his final payment, yes sir."
Contractor admitted that he had not paid the $32.60 which he was claiming and only saw fit to deny that the $32.94 was due to the Owner. The plans and material list do not require thermostats. Owner contends that through no fault of the Owner, Contractor saw fit to install larger bathroom heaters than were called for in the material list and that these larger heaters required that thermostats be installed. Contractor's claim is denied for the reason that he failed to prove it. Owner's counterclaim is granted for the reason that trial court awarded it and appellee has not complained of this ruling.
Contractor claims $350.00 for labor and material for tearing out cabinets. Contractor explains the claim:
"A. We put up the front of the cabinet when we first built it and he come there and told us how he wanted it first and then the next day it was different, so we kept tearing the front out and that snack bar that he wanted there and I had to make a couple of trips to Baton Rouge to get some more mahogany and between that and the labor went up to $350.00.
"Q. What kind of cabinets were called for by the specifications?
"A. Straight cabinet, no snack bar at all.
"Q. What kind did you put in?
"A. Just like he wanted, snack bar with a circle board in front.
"Q. Did Mr. Swinney request you to replace the cabinets?
"A. When I built it he told me that is what he wanted and that next morning that ain't what he wanted and we had to tear it down and do it again.
"Q. How many times did you tear it down?
"A. I tore that down three times.
"Q. How many people did you have helping you to tear it down?
"A. Merle Evans, on the cabinet I had Merle Evans."
It is Owner's contention that he only required Contractor to build the cabinets and drawers in the manner required by the plans. While Owner acknowledges that there are some changes, he states that the additions were to replace some items left out. In any event, there is no suggestion in any of the testimony that the Contractor ever suggested that these cabinet changes would cost extra, which leads us to hold that Owner was justified in concluding that the changes were not extras, but merely substitutions to bring the house up to the required standards. Contractor's carpenter Evans testified concerning the rebuilding of cabinets, but never referred to any discussion that these changes would cost extra. Contractor has therefore failed to prove that he is entitled to extra consideration for the cabinet work.
Contractor claims $15.00 extra for a shower door. The materials list calls for a sliding door and all parties agree that the sliding door would have cost more than the folding door which was substituted. Owner and Contractor each testify that it was the other's idea to change the door. In either event, Contractor agreed to build additional cabinets in the bathroom because the folding shower door would cost less than the sliding door. When the folding shower door was installed, it was agreed by all that it was unacceptable and Owner then purchased another one. The $15.00 extra charge by Contractor was for labor by the tile man for installing the second folding door. According to the Contractor, Owner selected the first folding door and ordered it from the tile subcontractor. Owner, on the other hand, denies that he ordered the door which proved unsatisfactory.
*783 Contractor did not see fit to call the tile subcontractor to verify Contractor's testimony that Owner ordered the unsatisfactory door. We, therefore, conclude that Contractor failed to prove that this extra is due by the Owner.
Contractor's claim for $165.00 for a change in bricks is denied. The materials list clearly called for "Norman Brick Brookhaven Brick Co." Contractor claimed the extra amount because in figuring his bid he planned to use local brick to build Owner's house and the Norman brick from Brookhaven, Mississippi cost an additional $165.00.
Owner's complaints set forth in Article 11 of his Answer and itemized from (a) to (t) inclusive may be considered as a group. All of these faults or changes were acceptable to the Owner when he moved in and offered to pay Contractor the full amount due less $300.00 which Owner claimed for the 30 day delay in delivering the house. Owner explained why these claims were made while under cross-examination in this way:
"Q. These various complaints that you have got itemized (a) through (t) in your petition, you went ahead and accepted those, didn't you?
"A. Yes sir, I accepted that under the original contract, that is the complaints that the house is not up to specifications after this thing was going to Court I had to make what the house was not uphe trumped up a bunch of charges against the house, that are not true and I had to makethe specifications to make the house come up to specifications, which those complaints that is what the house will you can have it inspected by any inspector and those complaints I made is actual fact of the house not being up to specifications.
"Q. But at that particular time you didn't make these complaints to Mr. Hebert, did you?
"A. I didn't make any complaints to Mr. Hebert because I agreed to take the house with Buster under the original contract."
Mr. Hebert, the inspector also testified that at the final inspection, Owner was satisfied except for one item not contained in the list (a) through (t). Furthermore, it is clear that several of these items were changes which were authorized by Owner. Owner failed to prove that he is entitled to any damages for the items listed as (a) through (t) in Article 11 of his reconventional demand.
Owner claims $300.00 contending that Contractor was 30 days late in delivering the house and the contract plainly provided that "House to be completed by 10-1-59 or pay $10.00 per day until completed." Although Contractor contended at the trial that he delivered the house only 23 days late rather than 30 days late, he offered no argument in his brief on this point. We find that the record shows that Contractor delivered the house 30 days after the October 1, 1959 deadline. However, the record makes it abundantly clear that the Owner did not place the Contractor in default. In the case of Haffner & Taylor v. Perloff, 174 La. 687, 141 So. 377, the Supreme Court held that where the building contract provided a completion date together with a liquidated damages clause, it was necessary that the Contractor be put in default. In that case at 141 So. page 378, the court stated:
"The judge overruled the objection (to evidence concerning the liquidated damages) on the ground that the stipulations of the contract did away with the necessity for a putting in default. The ruling appears to be contrary to the rulings in Davis v. Glenn, 3 La. Ann. 444; Allen v. Willis, 4 La.Ann. 98; Godchaux v. Hyde, 126 La. 187, 52 So. 269, and Herman Bros. v. Troxler, 166 La. 587, 117 So. 727. In those cases it was held that the mere expiration of the term stipulated for the completion *784 of the work, without the work's being completed, did not render the penal clause executory, unless it was stipulated also that the contractor should be in default by the mere expiration of the term stipulated. It was held also that the mere failure to finish the work within the time stipulated was a passive violation of the contract, and did not render the contractor liable for damages until he was put in default or unless he waived the putting in default."
See also Steel Const. Co. v. Louisiana Highway Commission, D.C., 60 F.Supp. 183. Owner has not argued this point in his brief nor cited any jurisprudence authorizing such a claim where there has been no putting in default or where the contract did not specifically waive this requirement. Therefore, Owner is not entitled to recover this $300.00 claim.
Owner next claims $7.50 for the gas tap, presumably for the connection to the City gas line. There is nothing in the plans and material list specifying who shall pay for this item. Owner testified that Contractor didn't want to connect the gas until after Owner moved in; that Owner thereafter put up the deposit (verified by an unnumbered exhibit in record) in Contractor's name; that Contractor put up the connection charges "for the utilities also the city hookup in Independence the sewerage, water all, that is all in his (Contractor's) name." Contractor testified that he didn't know anything about the gas tap charge and that so far as he knew it was not in the "specifications." However, neither does the contract, plans or material list specify who shall pay the connection charges for water, electricity, or sewerage, and Contractor paid these charges. Contractor does not contend that Owner did not pay this amount on behalf of the Contractor. Owner is entitled to recover this $7.50 item.
We must allow Owner's claim for $6.70 for door, lock and hinges for a screen door which was allowed by the trial judge. Contractor has not complained about this ruling. Owner testified that Contractor agreed to pay him back for this item, but Contractor testified at one time that he didn't know anything about this claim; if Owner mentioned it to him, he didn't hear it. On cross-examination, Contractor testified:
"Q. You deny that you are indebted to Mr. Swinney for $6.70 for door lock and hinges for the front screen door?
"A. I didn't say I deny although I don't know what it is for."
Owner failed to prove his claim for $80.00 for folding shower door. He did not introduce in evidence an invoice, but instead testified that he didn't know what the door cost.
To recapitulate, Contractor is entitled to $2,750.00 as the balance due on the contract, $54.00 for extras conceded to be due by the Owner, $127.50 for better quality plumbing fixtures, $74.00 for charges to tie in dishwasher, automatic washing machine, and heating system for which the plans only called for roughing in, or a total of $3,055.50. As against this, Owner is entitled to credits of $7.50 for the payment for the gas tap, $32.94 for two controls for bathroom heaters, $6.70 for lock and hinges, or a total of $47.14. Contractor is therefore entitled to judgment in the sum of $2,958.36.
For these reasons, the judgment of the district court is amended, and it is now ordered, adjudged and decreed, that there be judgment in favor of Plaintiff in the sum of $2,958.36, with legal interest from judicial demand; all costs to be paid by the defendant.
It is further ordered, adjudged and decreed that Plaintiff's lien and privilege recorded in No. B. 151 page 128, records of Tangipahoa, Louisiana, be recognized in the sum of $2,958.36.
It is further ordered, adjudged and decreed that the trial court's judgment in *785 favor of intervenor, Amite Building & Supply Co., Inc., and recognizing its lien and privilege is affirmed.
Affirmed in part, and amended and affirmed in part.