290 So.2d 415 (1974)
FLORIDA ICE MACHINE CORPORATION
v.
BRANTON INSULATION INC. and Commercial Union Insurance Company of America.
No. 5128.
Court of Appeal of Louisiana, Fourth Circuit.
February 15, 1974.
*416 Baldwin, Haspel, Molony, Rainold & Meyer, Lawrence J. Molony and Terence E. Hall, New Orleans, for plaintiff-appellee.
Jackson P. McNeely, New Orleans, for defendants-appellants.
Before SAMUEL, REDMANN and STOULIG, JJ.
SAMUEL, Judge.
Florida Ice Machine Corporation, plaintiff in this matter, was one of several general contractors engaged by New Orleans Cold Storage & Warehouse Company, Ltd., to construct a new refrigerated warehouse facility for it on the Mississippi River at the foot of State Street and Henry Clay Avenue in the City of New Orleans. Plaintiff's portion of this construction job included the plumbing, heating, air conditioning, refrigeration and insulation to be installed in the warehouse facility.
Plaintiff in turn subcontracted with Branton Insulations, Inc., the principal defendant (hereinafter referred to simply as "defendant")[1] for a portion of the insulation work, requiring it to "furnish and install Fiberglass pipe covering on refrigerant and drain lines per drawings and specifications." The subcontract was dated July 1, 1966 and the subcontract price was $24,000. Made a portion of this contract is a letter from the defendant to the plaintiff excluding from the subcontract work requirement hangers, saddles, supports, welding, and painting. While there is no written evidence showing the plaintiff consented to this exclusion from the work requirement, the conduct of the parties clearly indicates that both plaintiff and defendant regarded the subcontract to be amended by this letter.
An acceptance of the defendant's work was filed in the mortgage office on September 21, 1966, and the first indication of complaints concerning the defendant's insulation work was made on October 6, 1966.
The primary contention at the trial in the lower court was that the work done by the defendant was defective in that ice was forming on the outside of the refrigerant lines in numerous locations throughout the cold storage warehouse facility, and that these refrigerant lines were to be insulated by the defendant for the purpose of preventing the formation of such ice. In the *417 trial court the plaintiff's emphasis was on proving the defendant was guilty of poor workmanship. On appeal the emphasis in the plaintiff's argument is that, irrespective of proof or nonproof of defective workmanship, the ultimate result of the defendant's work was defective because its insulation did not in fact insulate.
After an extended trial the lower court rendered judgment in favor of the plaintiff against the defendant and its bonding company solidarily for $3,174, representing the cost of repairing a minor portion of the deficiencies complained of by the owner. In addition, the court rendered judgment in favor of the defendant on its reconventional demand and against the plaintiff for $3,327, representing $2,424 admittedly unpaid to it and an additional sum of $903 for "extras" performed by the defendant in the course of its work. From that judgment both the plaintiff and the defendants have appealed.
The contract specifications provide that a vapor barrier seal be installed regardless of the type of insulation used. The vapor barrier is specified to consist of a continuous membrane to be applied with vapor barrier adhesive, with a water vapor permeance of not than 0.1 perms. Specifications also called for a vapor barrier at all corners and expansion joints, sealing with adhesive over all leaks, tears, nail holes, bolt holes, and other perforations to provide a permeance no greater than that of the vapor barrier membrane, and the use of vapor barrier adhesive of such a nature as to afford a joint seal equal in performance to the permeance of the vapor barrier membrane.
Subsequent to the filing of the acceptance of the defendant's work in the mortgage office, numerous complaints began to develop with regard to ice forming on the insulation. The exact number of ice formations was never established, but all estimates indicate that the number was substantial, varying from 40 to 75 problems.
For approximately 15 months after the appearance of the defects, the defendant made numerous periodic trips to the owner's establishment in order to attempt to remedy them. Eventually, plaintiff obtained the services of Anco Installation of New Orleans, Inc., a related corporation, which performed work to remedy the defects at a cost of $16,056.87. Later, plaintiff used American Refrigeration Contractors, Inc., plaintiff's parent corporation, to perform repairs to the alleged pipe covering deficiencies in the amount of $4,402.28. The record is unclear with regard to exactly what work these two companies performed in order to earn the amounts paid to them.
The lower court found that no deficiencies existed in the plans and specifications and that the material used was not defective. The court further found that the plaintiff failed to prove, "by that preponderance of the evidence necessary for it to do in order to recover, that the work performed by the two contractors called in by plaintiff was made necessary because of `poor workmanship in the application of the vapor seal' as alleged, except as is hereinafter noted." The two exceptions will be discussed below.
The general nature of the defects complained of fall into two distinct categories. First, there were leaks with subsequent ice formations caused by a break in the vapor barrier at joints, elbows, and connections in the pipe. Second, there were failures in the pipe insulation at pipe hangers, apparently caused when the insulation was crushed between the weight of the pipe and the support upon which it was laid. Such a compression at hanger or support locations substantially reduced the thickness of the insulation at that spot with the result that the warm outside air condensed and froze on the cold pipe. Witnesses agreed that the breaking of an ice formation cleanly off the outside of the insulation is indicative of insufficient insulation thickness. On the other hand, they substantially *418 agreed that when ice went through the insulation it was evidence of a leak in the vapor barrier, and that such was the case where the insulation was crushed by the weight of the pipe mashing the insulation against hangers or pipe supports.
The law governing the performance of building contracts has its origin in Article 2769 of the Louisiana Civil Code, which provides:
"If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract." LSA-C.C. Art. 2769.
The jurisprudence interpreting this code article has made it clear that construction contracts are treated in a different manner than other commutative contracts. In the latter there can be no recovery in the absence of full performance. In the case of construction contracts, a substantial compliance with the contract is sufficient to justify recovery of the contract price by the contractor. The remedy against the contractor (or the subcontractor, as in this case) in the presence of substantial compliance or performance is to allege and prove the nature and extent of the unfinished or defective work in order to reduce the sum owed to the contractor by the amount of the cost involved in properly completing the contract work.[2] Therefore, the person proceeding against the contractor who has substantially performed must prove both the existence of the defects or omissions on the part of the contractor and the cost of repairing or finishing the defective work.[3]
It is also well settled that even if the existence of the defects or omissions and the cost of repairing them are proved, the person suing the contractor is nevertheless barred from recovering the cost of the defects if he accepted the work despite patent and obvious defects or imperfections discoverable upon reasonable inspection. Acceptance, however, does not bar recovery for defects not readily discoverable by ordinary inspection, for defects which manifest themselves subsequent to the acceptance, or for defects which are explicitly excluded from the terms of the acceptance.[4] With regard to the first category of defects described above, those which where were not discoverable by reasonable inspection at the time of acceptance, the evidence in its entirety discloses that the lower court was correct in concluding that the plaintiff did not bear the burden of proving by a preponderance of the evidence that these defects were caused by the defendant's defective work. For example, fames Summers, a representative of Pittsburgh Corning Foam Glass, testified on behalf of the plaintiff as follows:
"Q Did a great many of the areas appear to be where there were pipe hangers?
A A fair number.
Q Did a great number of the areas where there were repairs appear to be where there were elbows in the pipe?
A I say it would be more prevalent on an elbow than a straight run of pipe.
Q From what you remember where the repairs were made.
A Yes.

*419 Q What causes the vapor barrier in an elbow to fail?
A Well, we can stay here all day. It could be physical abuse from the outside. It could be if you didn't have the proper expansion lapps. It might have occurred by expansion and contraction of the pipe. It might be poor application of the vapor barrier.
Q From what you observed at the plant in regard to the number of elbows, which you saw repairs, do you have an opinion as to what caused the needs for the repairs at the cold storage facility?
A The only thing I can tell you, it's very evident that the vapor barrier had holes in it, because you had ice both on the interior and exterior. To conjecture as to what caused it, it could have been any of the reasons I named. Workmanship certainly is one of them.
Q It would be unlikely, would it not, that damage was done repeatedly and almost exclusively on elbows by running into it with objects, wouldn't it?
A You can run into it. Well, it's always possible to run into the cotton-pickin thing with a fork-lift."
Mr. Summers in effect stated that the defects in the vapor barrier on the elbows and joints could have been caused from physical abuse, improper expansion lapps, expansion and contraction of the pipe, or from improper workmanship.
Mr. Summers also gave the following testimony:
"Q I believe you mentioned something about damage being caused in one respect by physical abuse, and I think you mentioned fork-lift.
A I said it could occur.
Q Is it possible that in moving some of the boxes on fork-lifts, that even though these pipes are rather high, if you stack the boxes high, there is a possibility that they can be damaged by the fork-lift raising the things perhaps too high?
A There would be a possibility.
Q Have you had the experience of inspecting other similar plants, new plants?
A Yes, I have. I have been on detached duty at least 50 times in the last year to inspect cold storage jobs for Owens-Corning that were in litigation or might be, or might not be. And thisyes, this has occurred.
Q To your knowledge, in building a new plant, have other plants similar to this had problems similar to the ones that New Orleans Cold Storage has?
A You mean from a standpoint of vapor barrier?
Q And the icing up and what have you.
A Certainly other plants have had this problem.
Q Is this a rarity, or common occurrence among new plants?
A Among new plants, and I will be flat truthful, most new plants that go in, you are going to have some occurrence. Just as you would in the cold storage. They had numerous leaks in that that you fix. I will put it this way: I never put a major plant with a pipe covering on an ammonia plant that didn't have some leaks."
The plaintiff attempted to prove that some of the leaks were caused by puckers or "fish-mouths", being raised areas in the insulation sealing, which it further attempted to impute to the poor workmanship *420 of the defendant. However, with regard to this type of defect, Mr. Summers gave the following testimony.
"Q In connection with P-17, you were discussing the pucker or fish mouth. Does this always, without exception, occur due to poor workmanship?
A No, I can't say it would always occur due to poor workmanship. On that particular job some of the material you had was self-sealing lapp, which I described, which we manufacture. Some of it wasn't. Some of it, the vapor barrier lapped. It seals with a man applying mastic with a paint brush, and some sealed mechanically.
Q Were you able to determine from your inspection as to whether pucker or fish mouths were due to poor workmanship?
A I can't say. I can say there were some that occurred on the job. It could have been from poor workmanship or it could have been from other reasons."
Moreover, Mr. John J. Sabathe, testified on behalf of the plaintiff that he was called in by Anco Insulations in order to remedy the problems in the cold storage warehouse, including the problems of water stains. Mr. Sabathe is president of Local 53, Asbestos Workers Union and has worked in the insulation field for more than 28 years. In his work he not only installs insulation but also supervises a crew of insulators. He testified that he could not establish what caused the water stains on the insulation complained of by the owner and the general contractor. In so stating he testified as follows:
"Q Oh. Now, you say thattell me of course, this is your field, not my fieldsome of the tapingdid I understand you correctly, some of the taping had come loose?
A Yes, maybe about two or three inches. Not the whole thing.
Q Is that what caused some of the water stains to
A I don't know what caused that.
Q You don't know?
A No.
Q Where the taping comes looseyou say you have been in the business many, many yearsis this dueif you knowis this due to improper installation by the workmen, or is it due to
A Not necessarily. If he rubbed it down, left it a half hour or 20 minutes ago and didn't go back, then maybe somebody caught it later on. If they didn't catch it, it's going to stay like that. It just folds up like.
Q But is it necessarydoes it necessarily follow that where you found these instances, that it was due to poor workmanship? Or could it have been due to perhaps maybe not the best sort of glue on some of the tape?
A Could have been glue.
Q You don't know?
A No, I couldn't say what caused it to curl up."
He also testified without equivocation that he did not know what caused the frosting condition and that he did not think the defects resulted from poor workmanship. His testimony in this regard reads as follows:
"Q Were you able to determine what did cause most of the frosting up?
A No, I couldn't figure it out. You had a line running 30 feet, an elevation coming from that corner, and you traced the line out, and you had three or four spots with no ice coming through.
Q If they had insulated it while it was in operation
*421 A That could have caused it, they didn't finish the whole line up.
Q Did you find instances either in the engine room or cold room, or cold boxes, as you call them, where there was, as far as you were concerned, poor workmanship that was the cause of the ice forming?
A No, I don't think so. The workmanship looked pretty good. What caused the spots, I don't know."
It goes without saying that the defendant denied all possibility of defective workmanship and supplied nothing to benefit the plaintiff in its claim that the defendant did not properly apply the vapor seal.
It is a venerable rule of Louisiana law that when a trial court has made a finding of fact, its judgment will not be upset on appeal in the absence of manifest error in the lower court's ruling.[5] In the present case, we can find no error in the lower court's ruling that the plaintiff did not bear its burden of proving the defects complained of were caused by defective workmanship or any omission on the part of the defendant. On the contrary, the quoted testimony shows the weakness of the plaintiff's case in this regard and demonstrates that the trial court's finding of fact was correct.
With regard to the second category of defect complained of, namely the leak caused by the crushing of the insulation between the pipe and the pipe hangers, the testimony was also in conflict, even among the witnesses on behalf of plaintiff.[6] However, most of the witnesses, including the expert witness called by the defendant, agreed that there were failures in the pipe insulation at the site of the pipe hangers because the bottom chord of the supporting joist presented a sharp surface to the insulation material and the crushing or indentation of this material between the pipe and joist resulted in a loss of insulating potential at that point. The defendant's testimony is that in spite of the exclusion from the subcontract, by its letter, of pipe hangers, nevertheless it tacitly agreed to install pipe hangers, to be supplied by the plaintiff, which were designed to prevent an indentation or breaking of the vapor seal in the insulation. However, its testimony also is that the plaintiff did not furnish enough of these appropriate pipe hangers, either in size or in number, to allow the defendant to place them at all needed positions. On the other hand, plaintiff presented testimony diametrically opposed to this statement, and asserted that more than enough pipe hangers of all necessary sizes were in fact furnished to the job site, but were left unused by the defendant.
Irrespective of this conflict in testimony, and assuming only for the purposes of this opinion that the defendant breached an obligation to the plaintiff by allowing the pipe to rest on the solid support joists, such a defect is a patent one which is readily observable and discoverable upon reasonable inspection. Even the plaintiff quotes from Maloney v. Oak Builders, Inc., supra and agrees the law is settled that even if defects or omissions and the cost of repairing them are proved by an owner or contractor, he is nevertheless barred from recovering the cost of the defects or omissions if he accepted the work despite *422 patent defects or imperfections discoverable upon reasonable inspection.[7]
In the present case as the supervision of the work was performed by experts in the field of architecture and engineering, it is clear that the laying of a pipe across a rigid joist is not a defect which cannot be discovered upon reasonable inspection. Since this defect, if in fact it is a defect, was easily discoverable by reasonable inspection, and since the plaintiff filed a written acceptance of the work in the mortgage office without excluding these patent defects from the terms of the acceptance, plaintiff is barred from recovering the cost of those repairs.
Plaintiff relies on Town of Slidell v. Temple, supra,[8] as authority for the proposition that it need not prove the cause of every alleged defect by direct evidence but may rely upon circumstantial evidence to show defective workmanship. The case does not apply in view of the facts here before us. In the Temple case a subsurface sewerage pipeline broke after more than fourteen months of use. There was no evidence of damage from above the surface, and the repairing contractor established that the pipe was imperfectly sealed, which allowed sand seepage into a joint. This undermined the pipe's foundation and caused its failure. However, the evidence in the Temple case effectively eliminated all possibility of other causes for the failure, and there was no evidence that the defect in workmanship was discoverable upon reasonable inspection prior to acceptance of the work. Thus, the Temple case is not controlling on the facts now before us.
The appeal perfected by the defendant is addressed primarily to the trial court's finding of improper workmanship by the defendant in connection with insulating a pump and a piece of machinery known as a "Christmas tree" in the engine room of the cold storage plant. Defendant also contends the lower court committed error in computing the value of the repair work in making its award to the plaintiff. The evidence in the record supporting the finding of poor workmanship in connection with insulating the pump and the "Christmas tree" is the testimony of John J. Sabathe, who participated in the actual work of correcting the problems in the cold storage plant. That testimony by Mr. Sabathe stands uncontradicted in the record and there is no basis upon which to find manifest error on the part of the trial court.
With regard to the computation of the award, the trial court computed the number of hours to be spent in repairing the work on the pump and the "Christmas tree" and included therein the salary of a supervisor for the time required for its accomplishment. Defendant contends there is no evidence to establish that a supervisor was needed to oversee the work and that the lower court committed error by awarding plaintiff the sum of $949.20 representing the pay of one foreman for a total of 168 hours at $5.65 per hour. However, after reading the entire record, we are satisfied the particular work now being discussed was most difficult and complicated, and there is little doubt that mechanics should not have been allowed to perform the same without supervision of at least one foreman. It is true there was no evidence introduced to show the necessity of a foreman in order to repair the pump and the "Christmas tree" insulation. However, the entire record is so replete with statements demonstrating the difficulty of the work performed that we cannot say the lower court committed manifest error by awarding plaintiff the sum equal to the cost of a foreman's wages.
For the foregoing reasons, the judgment of the lower court is affirmed.
Affirmed.
*423 REDMANN, J., concurring with written reasons.
REDMANN, Judge (concurring).
Defendant's expert testified that a pinhole in the vapor barrier (causing pervasive icing) is not necessarily defective workmanship, and that under some conditions pipelines like those involved can be expected to "sweat" (causing water stain) regardless of the insulation and workmanship. This evidence justified the trial court's conclusion that, in general, the icing and water stain were not proven to have been the result of non-performance of the contract by defendant as to either workmanship or materials.
Despite some evidence to the contrary, there was also sufficient evidence from which the trial court could reasonably have reached its conclusion that some improper workmanship required the expenditure of $3,174 as painstakingly calculated by the trial judge.
I concur in affirmation.
NOTES
[1] Also made defendant is Commercial Union Insurance Company of America, Branton's bonding company.
[2] Loeb v. Nielson, La.App., 128 So.2d 447; Maloney v. Oak Builders, Inc., La.App., 224 So.2d 161.
[3] Loeb v. Nielson, supra; Ebert v. Chambers, La.App., 87 So.2d 613; Norman v. Brown, La.App., 83 So.2d 488; Spicuzza v. Ranzino, La.App., 73 So.2d 208.
[4] Maloney v. Oak Builders, Inc., supra; Gulotta v. Swinney, La.App., 143 So.2d 775; Justiss-Mears Oil Co. v. Pennington, La.App., 132 So.2d 700; DeLambre v. Williams, 36 La.Ann. 330.
[5] Town of Slidell v. Temple, 246 La. 137, 164 So.2d 276.
[6] For example, Mr. Summers stated that while the vapor barrier was broken from compression, he could not state that it was caused by defective workmanship. Mr. Kirk, of the firm of Architects-Engineers which designed the cold storage installation, while maintaining that the vapor barrier was broken by compression of the insulation, nevertheless admitted that there was frost on two lengths of pipe on which there was no hangers and no crushed insulation, thereby implying that the frost could have been the result of insulation of improper thickness. Finally, Mr. Sabathe testified he performed no repair work at the site of the pipe hangers, where the compression and break of the vapor seal would have occurred.
[7] Citation footnote 2.
[8] Citation footnote 5.