HOOD, Judge.
Robert Foster instituted this suit against Jeff D. Jackson, d/b/a Jackson Mortgage Service and Construction Company, to recover the cost of repairing alleged defects in a house which defendant constructed for plaintiff. The trial court rendered judgment in favor of plaintiff for $4,885.00. Defendant appealed.
The issues presented are whether defendant failed to construct the house in accordance with the terms of the contract and in a workmanlike manner according to standard practices, and if so, what would be the cost of repairing the defects.
Foster and Jackson entered into a contract on or about March 29,1973, under the terms of which defendant agreed to construct a residence building for plaintiff for the sum of $14,350.00. The written evidence of that contract consists solely of two drawings which were prepared by Jackson and a document identified as a “Proposal.” The two drawings included a lot plan, the front elevation and the floor plan of the house. The “proposal” appears to be an offer submitted by defendant Jackson to Mr. and Mrs. Foster to: “Build house — 3 bedrooms, living room, dining room, kitchen and bathroom.”
None of those documents specified the types of materials which were to be used in any part of the house. The proposal provided, however, that “all material is guaranteed to be as specified,” and that “All work to be completed in a workmanlike manner according to standard practices.”
Although Jackson did not sign any of the above documents, the evidence shows that he prepared them and submitted them to plaintiff. Mr. and Mrs. Foster signed the “Proposal,” indicating their acceptance of the offer submitted by Jackson.
Defendant began constructing the house in July, 1973, and he completed it the latter part of September of that year. Plaintiff and his wife accepted the house, signed the necessary papers to complete first and second mortgages on it, paid defendant the full amount due on the contract, and then moved into the house in October, 1973. Plaintiff has been living in the house continuously since that time.
Mr. and Mrs. Foster testified that the first time it rained after the house was completed water seeped in under the front door and stained or damaged a part of the living room carpet. They stated that some time thereafter, from two to five months after they began occupying the building, other defects in the construction became apparent. They made some complaints to Jackson, who promptly sent workmen out to correct the alleged defects, but he apparently did not correct them to plaintiff’s satisfaction.
*868 This suit was filed on February 25, 1975, or about 16 or 17 months after the house was occupied by plaintiff. Plaintiff alleges in Article Six of his petition that the defects in the house consist of the following:
(1) The roof (ceiling) coming loose from the carport;
(2) The eaves of the house coming loose;
(3) Carpet in the living room being ruined due to rain leaking through the house;
(4) Water leaking in around the front door;
(5) Kitchen sink leaking;
(6) Leaks in the bathroom;
(7) Paint on the outside of the house mildewing, peeling and buckling;
(8) Grill in the heater in the bathroom broken;
(9) Molding on the kitchen and bathroom floors mildewing due to leaks from the appliances. '
Foster asserts that the above defects “began to occur in approximately March, 1974,” and that they were caused by the “poor quality of work” performed by defendant and the “poor quality of materials” used by him.
At the trial defendant objected to the introduction of any evidence which tended to enlarge the pleadings. The objection was sustained and was made general. The pleadings have not been enlarged, therefore, and we are concerned on this appeal only with the defects which are specifically alleged in plaintiff’s petition.
The only expert called by plaintiff was Nolan J. Rogers, Sr., an experienced building contractor, who examined plaintiff’s home in February, 1975, about 16 months after the Fosters had moved into it. Rogers testified that he made no attempt to determine whether the materials or workmanship were defective, but that he merely noted the things which plaintiff said he wanted done, and he gave plaintiff an estimate or a bid of the total sum which would be required for performing all of the work which plaintiff pointed out to him. Rogers testified that:
“ . . . I’m not knocking nobody’s work, no. I’m just figuring — I’m just saying what that man made me figure when I went over there. In other words, that’s what I’m stating. Only what he told me. I didn’t tell that man what he should do. He asked me to do this for him, and I wrote it down, and that’s what I figured on . .”
***** *
“I done exactly what he asked me to do.”
Rogers informed plaintiff that he would make all of the repairs which the latter pointed out to him for the total sum of $4,885.00. He did not break down that figure to show the cost of repairing any particular item "or defect, however, and he conceded that the figures he gave included some items which were not specified in plaintiff’s petition. The defendant, who also is an experienced building contractor, did not have the house examined by another expert, but he testified as to the quality of the materials used and the workmanship on the house.
The trial court found that “apparently the contractor was doing his best to give as much home as he could for the price,” but that “he ended up with a home which was unsatisfactory and defective in respects alleged by the plaintiff.” The court found the home to be defective, and he awarded plaintiff the full amount of the bid submitted by Rogers, assigning as his reasons therefor that that was “the only estimate the court has for putting the home in a condition where it should be.”
We have concluded that the trial judge erred in awarding plaintiff the full amount of the bid or estimate submitted by Mr. Rogers.
Applicable here is the rule that a party proceeding against the contractor who has substantially performed a construction contract, bears the burden of proving both the existence of the defects and the cost of repairing or finishing the *869 defective work. Florida Ice Machine Corporation v. Branton Insulation, Inc., 290 So.2d 415 (La.App. 4 Cir. 1974); Maloney v. Oak Builders, Inc., 224 So.2d 161 (La.App. 4 Cir. 1969). If the owner fails to present any evidence as to the cost of repairing or correcting the defective work, he will not be entitled to recover. Elite Homes, Inc. v. Herrmann, 242 So.2d 614 (La.App. 4 Cir. 1970); Federico v. Kratzberg, 163 So.2d 843 (La.App. 4 Cir. 1964).
The defendant in the instant suit substantially completed the construction of the house. The burden rests on plaintiff, therefore, to establish the defects alleged and the cost of repairing or correcting those defects.

(1) Roof (Ceiling) of Carport

Plaintiff testified that some time after he moved into the home, the material used in constructing the ceiling of the carport began to sag and to come loose. Mrs. Foster testified that this occurred seven or eight months after they began occupying the house, at about the time a hurricane struck Franklin, although she believes the ceiling began to come loose before the hurricane occurred. When Mr. Rogers inspected the house in February, 1975, he advised plaintiff to renail the sagging parts of the ceiling of the carport and that was done by plaintiff. Plaintiff concedes that the ceiling of the carport no longer sags, and that that particular defect has been corrected, but he contends that the contractor used an inferior material in constructing the ceiling.
The material used for the ceiling of the carport was described as “Masonite” board. Plaintiff contends that plywood should have been used instead. At his instructions, therefore, Mr. Rogers included in his bid for making repairs the cost of replacing the entire ceiling of the carport with plywood instead of Masonite board.
The contract between plaintiff and defendant did not specify that plywood should be used to cover the ceiling of the carport. The evidence shows that it is a “standard practice” to use Masonite board for such a purpose in constructing relatively inexpensive homes, such as the one involved here. Mr. Rogers testified that some builders prefer to use that type material instead of plywood for that purpose, although he personally prefers not to use it and he thus does not “push it.”
We find no defect in the quality of the materials or in the workmanship insofar as the installation of the ceiling of the carport is concerned. The total estimate made by Rogers includes replacing the ceiling of the carport with plywood, and there is nothing in the record to indicate how much of that total bid should be apportioned to replacing the ceiling of that part of the house. In our opinion the trial judge erred in awarding plaintiff the total amount of the bid submitted by Rogers, since it included the cost of replacing the ceiling of the carport.

(2) Eaves of the House

Plaintiff complains that several months after he moved into the house, some of the material used to cover the eaves began to sag and come loose. After the house was inspected by Rogers, plaintiff renailed the sagging portions of the eaves, and he concedes that that has corrected the alleged defect in workmanship. He contends, however, that plywood instead of “Masonite” board should have been used on the eaves.
There is nothing in the plans, in the contract or in the evidence to indicate that plywood instead of Masonite board should have been used, and we do not consider the use of Masonite board under the eaves to constitute a defect of materials or workmanship.
Rogers testified that at plaintiffs instructions, he included in his total bid, the replacing of all of the “soffit,” or covering under the eaves of the house, with three-eighths inch plywood instead of Masonite board. He explained that he was not asked to determine whether there was a defect in the materials used, but that he was simply told to figure what it would cost to replace the covering under the eaves with plywood, and that he included that in his total bid. *870 The evidence does not show the cost of replacing the Masonite board with plywood.
We think the trial judge erred in allowing plaintiff to recover a sum which included the cost of replacing the Masonite board under the eaves with plywood.

(3)Damage to Carpets; and

(4)Water Leakage at Front Door

The evidence establishes that water seeped in the front door after heavy rains, and that the water had stained or discolored that part of the living room carpet which was near the door.
Mr. Rogers testified that the front door needed to be lowered to prevent water from seeping into the house. We are convinced that water seeped into the house and damaged the carpet as a result of defective workmanship, and that defendant is responsible for repairing that damage. The cost of repairing the front door and of replacing the carpet was included in the total bid which was submitted by Mr. Rogers. The evidence indicates, however, that the defect can be corrected by installing a “storm door” at the front of the house. Defendant Jackson estimated that such a door would cost between $70.00 and $80.00. We think plaintiff is entitled to recover $80.00 for that defect, plus the costs of installing the storm door. The evidence does not indicate how much it will cost or how long it would take a carpenter to install such a door. We, however, have decided to allow plaintiff the wages of a carpenter for one day to install the door. Rogers stated that he charges $6.50 per hour for his services, or $52.00 for an 8-hour day. We conclude that plaintiff is entitled to recover $132.00 for installing a storm door.
The evidence does not show how much of the carpet was damaged. We believe, however, that only the carpet which was in the living room could have been damaged by water seepage, since the front door opened directly into that room. A drawing of the floor plan of the house is in the record and it indicates that a maximum of 30 square yards of carpet would be required for the living room area. We have decided to allow $10.00 per square yard for replacing the carpet in that part of the house, or a total of $300.00 for that item of damage.

(5)Kitchen Sink Leaking

Plaintiff discovered a leak in the plumbing under the kitchen sink some time after he moved into the house. He reported that fact to defendant Jackson, and the latter promptly sent someone out to repair it. Plaintiff concedes that the defect has been repaired, and that there is no longer a leak under the kitchen sink. The evidence does not show that he incurred any expense in getting that corrective work done. He thus is not entitled to recover for that alleged item of damage.

(6)Leaks in the Bathroom

Mr. and Mrs. Foster testified that about four months after they began occupying the house there developed water leaks near the base of the commode and underneath the bath tub. Their testimony was supported by that of Mr. Rogers who observed those leaks when he examined the house. We are convinced that the leaks resulted from faulty workmanship on the part of the defendant, and that plaintiff is entitled to recover the cost of repairing those defects.
Rogers testified that it would be necessary to take out the bath tub in order to repair that leak. The evidence does not indicate how much it would cost or how long it would take a plumber to repair the leaks in the bathroom. We believe that it would be fair, however, to award plaintiff the cost of labor for two 8-hour days, at $52.00 per day, or a total of $104.00, for making these plumbing repairs.

(7)Paint on Outside of House

Plaintiff alleges that the paint on the outside of the house began “mildewing, peeling and buckling” a few months after the construction was completed. He instructed Rogers to include in his bid or estimate the cost of repainting the entire house, and Rogers thereupon included that *871 cost in his $4,885.00 bid. The evidence does not show how much of that bid was intended to cover the cost of repainting the building.
Plaintiff Foster admitted at the trial that the paint on the outside of the house had not peeled off or buckled, as alleged. He testified, in fact, that the paint “stuck to the wall,” that “it’s not falling off,” and that “the paint’s not coming off.” He stated, however, that there had developed “black spots all over the house.” The outside of the house was painted green, and we assume that the black spots he described were caused by mildew.
Rogers stated that it appeared to him that only one coat of paint had been put on the house when it was built, and that he thought the outside of the building needed a coat of paint. He stated, however, that he did not notice that the paint had peeled, buckled or mildewed. He testified “I haven’t seen mildew that I can remember,” and that plaintiff merely asked him to include the cost of repainting the house in his bid.
Defendant Jackson testified that he warned plaintiff that the type and color of paint which plaintiff selected was likely to mildew, and he suggested that plaintiff wash the house down with a solution of clorox and water to cure or prevent it. Plaintiff stated that he never washed the house with clorox, but he insisted that no one ever told him to do that.
We conclude that the mildew which developed on the house several months after the construction was completed was not caused by faulty materials or workmanship, and that defendant is not liable to plaintiff for the cost of repainting the building.

(8)Grill in Heater

The evidence indicates that one of the two clay radiants in a bathroom space heater was broken when plaintiff moved into the house. The cost of such a radiant is about $2.00. We find that plaintiff is entitled to recover $2.00 for that item of damage.

(9) Molding on Kitchen and Bathroom Floors

Mr. Rogers found no mildew affecting the moldings on the floor of the kitchen or bathroom. There thus is no merit to plaintiff’s claim that those moldings became mildewed due to faulty plumbing work on the part of defendant Jackson.
For the reasons assigned, the judgment appealed from is amended by reducing the amount of the award from $4,885.00 to the sum of $536.00. In all other respects the judgment of the district court is affirmed. One-half the costs of this appeal are assessed to plaintiff-appellee, and the remainder of the costs are assessed to defendant-appellant.
AMENDED and AFFIRMED.
WATSON, J., dissents and assigns written reasons.
DOMENGEAUX, J., dissents and assigns written reasons.