303 So.2d 911 (1974)
ALUMAGLASS CORP.
v.
ADMINISTRATRIX OF the SUCCESSION of Albert D. KENDRICK et al.
No. 9981.
Court of Appeal of Louisiana, First Circuit.
November 12, 1974.
Rehearing Denied December 16, 1974.
Writ Refused February 7, 1975.
*912 Frederick R. Bott, New Orleans, for appellant.
Tom F. Phillips, Baton Rouge, for appellees.
Before LANDRY, BLANCHE and NEHRBASS, JJ.
LANDRY, Judge.
Plaintiff, Alumaglass Corporation (Appellant), appeals from judgment partially denying Appellant's claims for labor and materials furnished on a subcontract with A. D. Kendrick (Kendrick), deceased, prime contractor on a building contract, which judgment also allowed Kendrick's reconventional demand for demurrage allegedly due to Appellant's delay of completion of the work. The Travelers Indemnity Company, Kendrick's surety, is also defendant herein. We affirm in part and reverse in part.
Kendrick was prime contractor under an agreement, dated January 8, 1965, to construct The Republic Tower, a building belonging to Republic Tower Corporation (owner), and situated in Baton Rouge, Louisiana. The structure, fourteen stories high, was to be erected by the somewhat unique technique known as lift slab construction. This method involved pouring the roof and all fourteen floors in the form of concrete slabs fabricated at ground level. Commencing with the roof, each slab was then jacked into position to become its respective component of the structure.
The prime contract was entered into on January 8, 1965. It provided for a completion date of October 31, 1965. On an undisclosed date, completion time was extended to January 1, 1966, and demurrage for delay in completion was increased from $100.00 to $500.00 per calendar day. Substantial completion date is not shown. However, on October 18, 1966, the owner filed a formal acceptance. It is shown that inordinate delay was caused by many factors including adverse weather, labor strikes and shortage of workmen. Despite acceptance, owner maintained a "punch list" of incomplete or unacceptable items which were worked on and corrected, following completion, by many subcontractors, Appellant included. Eventually settlement was made between the owner and Kendrick including a compromise of the amount of demurrage due. Through negotiation, a demurrage of $15,000.00 was agreed upon, which amount Kendrick paid the owner.
Plans and specifications provide that the building be enclosed by a non-load bearing curtain wall or "skin" made of prefabricated aluminum and glass panels, with insulation. Appellant re-subbed to Architectural Metal Erectors, Inc. (AME), a now defunct corporation, the work of erecting the curtain wall.
Each slab was fitted with ¼ anchor plates attached to the upper section along the entire outer edge of the slab. The plates were attached by way of metal arms or rods welded to the plate and embedded in the slab. Through each plate holes were drilled at specified intervals to accommodate bolts measuring ½ in diameter by 1½" in length. Before the anchor plates were embedded in the slabs, the bolts were inserted through the holes in the anchor plates. The head of each bolt is therefore also embedded in the slab. Each bolt extended approximately 1¼" beyond the anchor plate through which it passed. The plans called for the skin panels to rest upon steel shelf angles secured to the anchor plates by means of the protruding bolts. The vertical arm of each shelf angle was provided with a slot to accommodate these bolts, which when passed through the slot allowed the shelf angle to be secured to the bolt by means of a washer and nut. With the shelf angles thus secured in place, the wall panels were *913 bolted to and rested upon the horizontal arm of the shelf angles. Vertical support for the wall panels was provided by mullions extending from the second floor upward to the roof. These mullions formed a stiff back for the wall panels, holding the panels in place both vertically and laterally.
The contract also provided that, when elevated to their respective positions, the floor slabs would be aligned to a vertical tolerance of 3/8 plus or minus, thus providing for a total variation of 3/4".
Unfortunately, when the slabs were finally positioned and work scheduled to begin on the curtain wall on or about January 10, 1966, it was found that some slabs were not level, and others exceeded the tolerance figure provided for in the contract specifications. When AME discovered that the floors were out of alignment, the matter was brought to Kendrick's attention. Although Kendrick engaged surveyors to check the elevations, the result of the survey does not appear of record. It is established beyond doubt that in many instances the slab elevations exceeded the allowed tolerance factor thus making corrective work absolutely necessary. This condition was dismissed with Kendrick. In some instances, AME remedied the condition by punching new holes in the vertical arms of shelf angles. Where the variation was such that it could not be remedied by punching holes in the shelf arms, extensions were welded to the anchor plates. AME billed Appellant for this work, and Appellant in turn billed Kendrick therefor in the sum of $5,331.64. Appellant's demand for this item was rejected below because of Appellant's failure to show approval of the work as an extra required by the Appellant's subcontract.
After all floors were in place, some were found to be out of plumb. In these instances, the walls and floors did not meet at right angles, and consequently there were gaps, in varying dimensions, where these walls and floors should have met flush with each other. To correct this problem, Kendrick approved, as an extra, the design, fabrication and installation of ceiling closures which cost $4,480.00. Kendrick concedes liability for this item.
Unrelated to the alleged faulty construction, Appellant claims $252.00 for cutting a circular hole 2½" in diameter in 96 wall panels for installation of electrical outlets not included in the original plans and specifications. This work was requested by the architect. Shop drawings prepared by Appellant pursuant to the architect's request, show these additional outlets. Said drawings were approved by the architect's endorsement thereon under date of December 7, 1965. The trial court disallowed this item also on the ground it was not shown to have been approved as an extra by Kendrick.
In November, 1966, Appellant liened the building in the amount of $27,749.29. The amount was calculated by adding to the contract price of $175,337.25, the sum of $4,480.00 admittedly owed by Kendrick for the ceiling closure work, making a total of $179,817.25 admittedly due Appellant. In addition, Appellant claimed the $5,331.64 expended for modifying shelf angles, and $252.00 for cutting holes in panels for electrical outlets not called for on the original plans. Consequently, Appellant's total was $185,400.89. Appellant acknowledged payment of $156,651.60. Appellant erroneously calculated the balance at $17,686.65, which balance should have been $18,686.65. To said erroneous balance, Appellant added the $4,480.00 due for ceiling closures, $5,331.64 claimed for work on shelf angles and $252.00 for cutting holes in panels, and claimed an unpaid balance of $27,749.29, which should have been $28,749.29. Subsequent to the lien filing, Kendrick paid an additional $17,363.70, or a total of $174,015.30. Appellant's error was not corrected when suit was filed to reduce Appellant's claim to judgment. As a result, Appellant claims herein only $10,385.59, which includes $321.95 due under the original contract. Appellant did not amend its petition to claim the $1,000.00 omitted due to an error *914 in computation, and acknowledged that its recovery would be limited to the amount for which suit was entered.
Basically, Appellee resists payment of the $5,331.64 claimed for modifying shelf angles on the ground that Kendrick did not consent thereto. In this connection, Kendrick relies on a contract provision which states that the contract price shall be "subject to additions and deductions for changes as may be agreed upon".
The testimony of William Argus, President of plaintiff corporation, Frank Lestelle, Erection Superintendent of AME, and Roy C. Rackley, former employee of Kendrick, establishes beyond doubt that the floors, when raised to position, did not meet the tolerance levels provided in the contract. Said witnesses further establish that the resultant condition required alteration of numerous shelf angles. The problem was recognized by Kendrick whose representatives discussed the matter with Appellant and AME. It also appears beyond doubt that neither AME nor Appellant were responsible for this condition. Further, it is shown that the necessary corrective measures were undertaken by AME with Kendrick's knowledge and approval.
In proof of its claim for shelf angle modifications, Appellant introduced invoices from AME totaling $4,846.95 for the extra work involved. To this Appellant added 10%, or $484.69, to cover its overhead and handling of the matter, and billed Kendrick for $5,331.64.
Kendrick opposes payment of this item on the additional ground that Appellant failed to establish payment thereof to Appellant's subcontractor, AME. In this regard, we note the testimony of Argus, and AME's manager, Frank Lestelle, which shows the invoices were sent to Appellant in the regular course of business. It is further shown that AME had performed numerous subcontracts for Appellant, and that, under Appellant's accounting system, credit had been allowed AME on sums owed Appellant by AME in the amount of the $4,846.95 involved. We find that Appellant has sufficiently shown payment to AME.
Our law is settled to the effect that where remedial work, not contemplated by a subcontract, is required to complete a project in accordance with plans and specifications, the cost of such remedial work must be borne by the party at fault. Pittman Construction Co. v. City of New Orleans, La.App., 178 So.2d 312; Gross v. South-coast Contractors, Inc., La.App., 261 So.2d 383.
The shelf angle corrections were not extras in the ordinary sense of the word which usually means additional work to accomplish an object or purpose not contemplated in the original contract. The shelf angle changes were not additional work in this usual sense, rather they were changes required to accomplish an object specifically set forth in the original contract. In the bid proposal letter to Kendrick, dated January 18, 1965, Appellant made it clear that its proposal to install the curtain wall was conditioned upon Kendrick properly placing the anchor plates in the floor slabs. Appellant also noted therein that because of the type of construction employed, Appellant would not recommend commencement of wall erection until all slabs were in proper alignment, unless Kendrick guaranteed and would be responsible for the correct positioning of the slabs.
The record leaves no doubt that Kendrick was at fault in not properly aligning the slabs as required. Since Kendrick was at fault in this instance, responsibility therefor rests upon Kendrick who must bear the cost of remedying the error. See Pittman Construction Co. and Gross, above.
The $252.00 claimed by Appellant for cutting electrical outlet holes in 96 panels is a true extra. It was not contemplated by the original contract plans and specifications. The record shows only that this extra was requested and approved by *915 the architect who endorsed shop drawings made by Appellant showing this item. There is no showing that Kendrick approved the item and agreed to perform the work as an extra. Neither is there a showing that Kendrick agreed to reimburse Appellant the cost thereof. It is elementary contract law that the architect and Appellant could not bind Kendrick to an extra without Kendrick's knowledge and consent. We find that this item was properly disallowed.
Appellant's subcontract provides that the wall must be completed within 100 calendar days after the building was ready for wall installation. On notice by Kendrick, AME attempted to begin erecting the wall on January 11, 1966. However, it is clear that on this date the building was not ready to receive the wall panels because of the problem discovered with respect to slab alignment. It is also significant that Kendrick installed an outside hoist to transport material and workmen from the ground to the various floors and roof. This type of hoist did not permit installation of wall panels until the hoist was removed. It also appears that at the time Appellant signed the subcontract, Kendrick had not yet decided to use this kind of hoist on the job. The hoist was removed June 27, 1966, approximately 160 days after Kendrick declared the building ready to receive the curtain wall. Obviously AME could not install panels in the hoist area until the hoist was taken away. On June 29, 1966, AME began installation of panels to enclose the 13th and 14th floors and the hoist area. This work was completed July 26, 1966.
Meanwhile, the ceiling closures had not been installed because Kendrick did not authorize Appellant to make the ceiling closures until August 23, 1966. Appellant then ordered materials required for the closures pursuant to plans prepared by the architect under date of August 17, 1966. In a memorandum dated December 14, 1966, Kendrick asserted that Appellant was responsible for delays beyond July 26, 1966. From the above, it is obvious that delays beyond August 23, 1966, were due to circumstances occasioned by Kendrick's fault inasmuch as Kendrick's error made the ceiling closures necessary. Kendrick contends Appellant took 117 days, excusable delays excluded, to complete the wall, which is 17 days more than allowed. However, it appears there was no excusable delay allowed for time lost because of Kendrick's errors, and also due to Kendrick's decision to erect an outside hoist after Appellant signed the subcontract.
Mrs. Kendrick testified that her husband died April 15, 1966. Thereafter she assumed control of the work to complete the contract. She acknowledged that owner's acceptance was accompanied by a demand for demurrage. She conceded a dispute arose as to the demurrage, which matter was resolved after considerable negotiation. She stated that ultimately a compromise demurrage figure of $15,000.00 was agreed upon and paid. However, she did not state, and the record does not otherwise show, how this compromise figure was computed. It does not appear whether the agreed demurrage was for 30 days at $500.00 per day, as provided in the contract, or whether it represented agreement as to a greater number of days delay at a lesser amount per day. Mrs. Kendrick also testified that she arbitrarily assumed 50% of the demurrage cost, and also arbitrarily parceled the remaining 50% out among the various subcontractors on the job. She concluded Appellant's fair share of the demurrage was $1,500.00. In allowing Kendrick recovery of this amount, we find the trial court erred in two respects. We find a lack of convincing proof of delay attributable to Appellant. We also find allocation of $1,500.00 demurrage to Appellant was purely arbitrary on Mrs. Kendrick's part.
The trial court properly disallowed Appellant recovery of $1,000.00 resulting from Appellant's mathematical error. It is elementary that a litigant may not recover an amount greater than that for which he prays. Friedman Iron & Supply Co. v. J. B. *916 Beaird Co., Inc., 222 La. 627, 63 So.2d 144. In this instance, Appellant elected to waive collection of the amount claimed by virtue of its error. Under the circumstances, no portion thereof may be recovered herein.
The judgment of the trial court is affirmed insofar as it disallows Appellant's claim for $252.00 as an extra for cutting holes in wall panels. The judgment is reversed insofar as it disallowed Appellant's claim for $5,331.64 as extras for modifying shelf angles and also reversed insofar as it granted Kendrick's reconventional demand for $1,500.00 demurrage.
Judgment is also awarded herein in favor of plaintiff, Alumaglass Corporation, and against defendant, Administratrix of the Succession of Albert D. Kendrick and The Travelers Indemnity Company, in solido, in the full sum of $10,133.59, with legal interest thereon from date of judicial demand, until paid, and all costs of these proceedings.
Affirmed in part, reversed in part, and rendered.