369 So.2d 213 (1979)
Dennis EHRHARDT, Individually and for and on Behalf of his minor daughters, Deanna and Cindy Ehrhardt, and Shirley Ehrhardt, Plaintiffs-Appellees,
v.
Robert L. CUMMINS, Sr., Individually and as Administrator of the Estate of his minor son, Shawn T. Cummins, and Government Employees Insurance Company (GEICO), Defendants-Appellants.
No. 6868.
Court of Appeal of Louisiana, Third Circuit.
March 7, 1979.
Writ Refused April 23, 1979.
*214 Voorhies & Labbe, William M. Bass, Lafayette, for defendants-appellants.
J. Minos Simon, Lafayette, for plaintiffs-appellees.
Before DOMENGEAUX, GUIDRY and CUTRER, JJ.
GUIDRY, Judge.
Plaintiffs were involved in a vehicular accident on August 15, 1976 in the city of Lafayette. Mr. Dennis Ehrhardt and his wife, Shirley, and their two minor daughters, Cindy and Deanna, were riding in their family car when it was struck from the rear by an automobile owned by Robert Cummins and operated by his minor son, Shawn Cummins. At the time of the accident, defendant's vehicle was insured by Government Employees Insurance Company (GEICO). Suit was instituted by plaintiffs against Robert Cummins individually and *215 as administrator of the estate of his minor son and GEICO to recover damages allegedly suffered by plaintiffs as a result of the accident. Defendants stipulated liability and trial was held solely for the purpose of fixing the amount of plaintiffs' damages. After hearing lay and medical testimony, the trial court awarded Mrs. Ehrhardt the sum of $15,500.00 for past and future pain and suffering resulting from "cervical strain of a mild or moderate nature" and an "aggravation to the low back problem which she had prior to the accident". The trial court also awarded Dennis Ehrhardt, on behalf of his minor daughter, Deanna, the sum of $750.00 for several "postconcussion headaches" which it found she had suffered as a result of the accident. In addition the court awarded Dennis Ehrhardt special damages in the amount of $2711.04. From this judgment defendants have appealed. The assignments of error urged by appellants are as follows:
I. THE AWARD OF $750.00 TO DENNIS EHRHARDT ON BEHALF OF DEANNA EHRHARDT WAS EXCESSIVE.
II. THE AWARD OF $15,500.00 TO MRS. SHIRLEY EHRHARDT WAS EXCESSIVE.
III. THE SPECIAL DAMAGES AWARDED FOR "MAID SERVICES" EXCEEDED THE AMOUNT PRAYED FOR BY PLAINTIFFS, AND SHOULD THEREFORE BE REDUCED.
Although LSA-Const. Article 5 Sec. 10(B) imposes upon the appellate courts the duty of reviewing damage awards, the character of our review function in this area is limited by LSA-C.C. Article 1934(3)[1], which gives the trial court great discretion in fixing such awards. In the often quoted case of Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977) the Supreme Court stated:

"We do reemphasize, however, that before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award. Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351, supra; Bitoun v. Landry, 302 So.2d 278, supra; Fox v. State Farm Mutual Automobile Ins. Co., 288 So.2d 42, supra; Walker v. Champion, 288 So.2d 44, supra. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. Bitoun v. Landry, supra; Spillers v. Montgomery Ward & Company, Inc., 294 So.2d 803, supra. It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence."

at pg. 335.
It is with consideration of the above principles applicable to appellate review of quantum awards that we have reviewed the record to determine if the trial court's much discretion was abused in the instant case.
I. WAS THE AWARD TO DENNIS EHRHARDT ON BEHALF OF DEANNA EHRHARDT EXCESSIVE?
The accident in question took place at approximately 11:45 a. m. on a Sunday. The record reveals that immediately after the accident, Cindy and Deanna, who were seated in the back seat of plaintiff's vehicle, were taken directly home and were not examined by a physician. That same afternoon Deanna went swimming. On August 28th, some twelve days after the accident, Deanna was taken to the emergency room of Lafayette General Hospital complaining of having occasional headaches. Dr. James Rivet, a neurosurgeon, examined Deanna on that date in the emergency room. Dr. Rivet *216 testified at trial that he took x-rays of Deanna which he found to be normal. He stated that he also did a detailed neurological examination on her, which he found to be completely normal. He testified that Deanna's headaches ". . . were probably secondary to a very mild concussion cerebral concussion", which he termed incident to a "light blow to the head". Deanna again saw Dr. Rivet on September 16, 1976, at which time she told him that she had only had one minor headache since her previous examination on August 28th. Dr. Rivet nevertheless performed an electroencephalogram on her, the results of which were normal. He saw her again on June 27, 1977, at which time she complained of headaches when she was out in the heat and after participating in gymnastics. Dr. Rivet testified that he found it to be normal for a ten year old child to experience headaches after stressful activities, and that he was unable to associate this recurrence of headaches with the accident. On October 24, 1977, Deanna made her last visit to Dr. Rivet, at which time he was informed that she no longer suffered from headaches. It appears from the record that Deanna saw Dr. Rivet four times relative to complaints following the accident.
At trial, Deanna testified that along with headaches, she suffered from dizziness which made her unable to stand or walk. Her mother testified that Deanna's dizziness and headaches caused her to keep Deanna out of gymnastics for a year. Dr. Rivet testified that his records on Deanna included no complaint of dizziness although he did state that dizziness was often associated with postconcussion headaches. The record does not reflect that Mrs. Ehrhardt's decision to keep Deanna out of school gymnastics was made pursuant to doctors' instructions.
The record reflects that Deanna saw no doctor other than Dr. Rivet concerning her complaints following the accident. In sum, Dr. Rivet's testimony reflects that from the date of the accident until August 28th, Deanna suffered from an occasional headache, and that thereafter she only suffered one headache which he could reasonably associate with the accident. After his initial examination, he told Deanna to take it easy, but he apparently put no restrictions on her activities. Considering both the lay and medical testimony and applying the principles set forth in Coco, supra, we are unable to categorically conclude that the award exceeds the highest amount which was reasonably within the discretion of the trial court to award. We therefore will not disturb this award.

II. WAS SHIRLEY EHRHARDT'S AWARD EXCESSIVE?
The record reflects that prior to the accident, Mrs. Ehrhardt suffered with a degenerative back condition. Mrs. Ehrhardt's back problem began sometime in 1972, as the result of demonstrating exercises to a kindergarten class she was teaching. For this problem she had been treated by several local physicians but at the time of accident she was being treated by physicians in Houston, and had, prior to the accident, elected to undergo back surgery in that city. She was scheduled to have surgery performed on her back in December, 1976. She testified that at the time of the accident, she was concerned that she might have reinjured her back, and she was therefore immediately taken to the emergency room of Lafayette General Hospital. At the emergency room, Mrs. Ehrhardt was examined by Dr. Stephan Goldware. Dr. Goldware testified that at the time of his examination, Mrs. Ehrhardt told him she had a seven year history of low back pain which had worsened in the three previous years. She informed Dr. Goldware that she had scheduled back surgery for December, 1976 in Houston. The results of Dr. Goldware's examination were as follows:

"(Her) Blood pressure and pulse were normal. She was complaining of some pain in her head and the left side of her neck and in her low back. On examination there were no focal motor sensory or reflex deficits. The tympanic membranes were normal. Fundi, optic fundi were normal. She was reluctant to bend *217 and touch her toes. Straight leg raising test was negative. She had a full range of motion of her neck and there was no unusual tenderness. . . ."

Dr. Goldware further testified that following his examination of Mrs. Ehrhardt, he released her. He next saw the plaintiff on September 7, 1976, at which time she complained of having some pain in her neck, left shoulder and interscapula area, which did not radiate into her arms. Dr. Goldware found that her gait, strength sensation and reflexes were all normal at that time. He further testified that a Spurling maneuver was performed on her, consisting of the twisting of her head and the placing of pressure on the top of her head, which she told him caused her some pain in her neck, but none in her arms. The results of the test were negative. Mrs. Ehrhardt's last visit with Dr. Goldware was on September 24, 1976, at which time she told him that her neck still hurt "some". Another Spurling maneuver was performed on her, the results of which were again negative. The doctor testified that his examination at that time revealed normal strength and reflexes. On September 24, 1976, Dr. Goldware released Mrs. Ehrhardt from his care, and placed no limitations on her activities.
Dr. Goldware did not evaluate the plaintiff's back problem, either before or after the accident, nor did he assess or diagnose the exact source of Mrs. Ehrhardt's complaints of neck pain, except to state that during each of his three examinations, he found no serious physical injury. His testimony related only to three examinations of the plaintiff, during which time she complained of neck, shoulder and low back pain which could not be explained through testing, but which had subsided to such an extent by September 24, 1976 that he discharged her and recommended that she return to normal activity.
While Mrs. Ehrhardt was seeing Dr. Goldware, she was also seeing her family physician, Dr. James Fournet. Dr. Fournet testified that he first saw Mrs. Ehrhardt regarding the accident on August 16th, at which time she told him that she had been involved in an automobile accident the preceding Sunday, and that she was experiencing neck and low back pain. Dr. Fournet testified that at the time that Mrs. Ehrhardt first came to see him following the accident, he was aware that she had a preexisting back problem which was being treated by medical specialists in Houston. However, he testified that his knowledge of her condition was based only upon Mrs. Ehrhardt's own statement and some x-rays that he found in her clinical records which had been taken in May of 1974 and January of 1976. The x-rays, he stated, revealed a moderately advanced degenerative change in the lumbrosacral interspace. However, he stated that at no time prior to the accident had he personally examined the plaintiff's back. Although he was aware that she had a back problem predating the accident, he nevertheless chose not to take x-rays of her low back when she came to see him after the accident. With regard to the condition of plaintiff's back following the accident, he stated:
"I think she had a problem prior to the accident and I think she maintained her problem subsequent to the accident. I think in addition to, you know, the existing condition, that she had probably an acute flareup of her symptomatology."
Dr. Fournet's testimony is otherwise void of any other assessment of the effect of the accident on the plaintiff's preexisting condition. He stated that her recuperative period following the accident was probably longer because of the preexisting problem, but he also stated that the trauma did not cause any increase in the overall stability of her back. A fair assessment of his testimony would be that following the accident, the pain which the plaintiff was experiencing because of her longstanding back problem "flared up", and caused her to experience a longer recuperative period than she would have experienced if she had not had the preexisting condition. However, nowhere in his testimony did he make a long term prognosis of the plaintiff's back problem, or offer any indication that the degenerative process of the plaintiff's preexisting condition was at all accelerated by the accident. *218 More notably, plaintiff did not present the testimony of the doctors in Houston who had been treating her back prior to the accident and who continued to have primary responsibility for treating her back after the accident. Clearly, these doctors were in the best position to evaluate Mrs. Ehrhardt's preexisting condition, and to assess the effect, if any, of the accident on such condition. Dr. Fournet saw Mrs. Ehrhardt a total of six times from the date of the accident until April of 1977. He did not see Mrs. Ehrhardt following her back surgery in May of 1977. Therefore, no medical evidence was offered to assess the state of Mrs. Ehrhardt's back after April of 1977 or to indicate that she will experience any future back or neck pain as a result of the accident. It is apparent from the record that the only doctors who had particular knowledge of Mrs. Ehrhardt's back condition, from long before the accident until after her back surgery in May of 1977, were the doctors she was seeing in Houston. However, plaintiffs failed to produce any evidence from these doctors to support their claims for damages for future pain and suffering, or for residual aggravation of plaintiff's preexisting condition.
Dr. Fournet testified that his primary concern following the accident was Mrs. Ehrhardt's complaints of cervical pain. He stated that x-rays taken shortly after the accident revealed only a slight reversal of the lateral lordotic curve. He testified that by October, 2, 1976, the muscle spasm in the plaintiff's neck had already begun to subside, and that within six months she had full range of motion in her neck. Although he made no precise long term diagnosis of the plaintiff's neck problem, he did state that her cervical strain should have resolved itself within twelve months or eighteen months at most. When asked by plaintiff's counsel to explain the basis for plaintiff's complaints of continuing neck pain following activities such as jumping up and down, Dr. Fournet testified that he would "find it hard to believe" that an individual with her symptomatology would be continuing to have difficulty. He stated that he did not examine Mrs. Ehrhardt relative to her accident-related complaints after April, 1977, and that he examined her a total of six times in the course of his treatment.
Examining the medical evidence in a light most favorable to Mrs. Ehrhardt, we find nothing to indicate that she has suffered any residual impairment to her neck or back as a result of the accident. She had a preexisting degenerative back condition, for which she had elected to undergo surgery prior to the accident. Back surgery was performed on the plaintiff in May of 1977. The record is void of any evaluation of the effect of the accident on her preexisting condition other than Dr. Fournet's testimony indicating that the accident caused a temporary flareup of pain. The doctors who had been long treating the plaintiff's back problem, and who continued after the accident to treat her, were never called to testify, although they had peculiar knowledge concerning the nature and extent of her back condition. Insofar as Mrs. Ehrhardt's neck injury is concerned, her family physician diagnosed her problem as a mild cervical strain, which should have resolved within eighteen months at most. The plaintiff herself testified that her back surgery had been initially postponed from December of 1976 because of the pain she was having in her neck. She stated that her doctors in Houston did not want to perform surgery until her neck was "in good enough condition" to proceed. The fact that she did undergo back surgery in May of 1977 clearly indicates that neither she nor her doctors in Houston were overly concerned about her neck problem at that time to again postpone her back surgery. Although Mrs. Ehrhardt testified that her neck and back pain continues to the present, and that such pain has caused her to restrict her activities to some extent, she also testified that one week after the accident when the new school year began, she reported to work in time to start the semester. She testified that she remained on the job throughout the 1976-1977 school year.
We find Mrs. Ehrhardt's complaints of continuing neck and back pain to be greatly disproportionate with and unsupported *219 by the medical testimony presented at trial.
Our consideration of the totality of the evidence clearly reveals that the award of $15,500.00 to Mrs. Ehrhardt exceeds the highest amount reasonably within the much discretion afforded the trial court, and represents a manifest abuse of such discretion. Under the principles set forth in Coco, supra, we are able to reduce this award only to the highest point which was reasonably within the discretion afforded the trier of fact. We therefore reduce Mrs. Ehrhardt's award from $15,500.00 to $10,000.00, which is at the very highest point reasonably within the much discretion afforded the trial court under the circumstances of this case.
III. SHOULD THE SPECIAL DAMAGES AWARDED FOR "MAID SERVICES" EXCEEDING THE AMOUNT PRAYED FOR BY PLAINTIFFS BE REDUCED?
In their original petition, plaintiffs prayed for special damages as follows:
"Petitioner Dennis Ehrhardt, as head and master of the community of acquets and gains existing between himself and petitioner Shirley Ehrhardt, and individually and for and on behalf of his minor daughters, Deanna and Cindy Ehrhardt, alleges that as a result of the aforementioned injuries to himself, Shirley, Deanna and Cindy Ehrhardt and the care and treatment therefor he incurred the following expenses, to-wit:

(A) Dennis Ehrhardt
 Dr. Reese $ 8.00
(B) Shirley Ehrhardt
 Dr. Fournet 81.00
 Travel to Dr. Fournet 16.00
 Dr. Ehini 13.00
 X-rays 38.00
 Lafayette General Hospital 99.00
 Dr. Eppright 10.00
 Travel & Meals to Houston
 (Dr. Eppright) 121.00
 Pharmaceuticals 110.00
 Physical Therapy 184.00
 Travel to Physical Therapy 100.00
 Main (sic) Service 1032.00
 Secretarial Services for Shirley
 Ehrhardt 30.00
(C) For and On Behalf of his Minor
 Daughter, Deanna Ehrhardt
 Lafayette General Hospital 71.00
 Electronencephalogram 50.00
 Dr. Rivet 70.00
 Dr. Reese 8.00
 X-rays 25.00
 Travel to physicians and hospitals 8.40
(D) For and On Behalf of his Minor
 Daughter, Cindy Ehrhardt
 X-rays, Lafayette General Hospital 25.00
 ________
 TOTAL $2669.40"
 ========

At trial, plaintiffs sought to introduce evidence that they had expended $2,361.50 for maid services, and defendants objected to the admission of such evidence on the grounds that the pleadings specified maid expenses in the amount of $1,032.00, and that admission of such evidence would constitute an enlargement of the pleadings. The trial court overruled defendants' objection, allowed the evidence to be admitted, and awarded plaintiffs the sum of $1248.00 for maid services.
The general rule is that a litigant may not recover an amount greater than that for which he prayed in his petition. Friedman Iron and Supply Co. v. J. B. Beaird Co., Inc., 222 La. 627, 63 So.2d 144 (1952); Alumaglass Corp. v. Succession of Kendrick, 303 So.2d 911 (La.App. 1st Cir. 1974); writs refused February 7, 1975; Watson v. Morrison, 340 So.2d 588 (La.App. 1st Cir. 1976), writs refused February 14, 1977. The only exception to this rule of which we are cognizant involves elements of special damages in situations when otherwise inadmissible evidence is admitted without objection and the pleadings are enlarged to that extent. LSA-C.C.P. Article 1154; Sterkx v. Gravity Drainage District No. 1 of Rapides Parish, 214 So.2d 552, (La.App. 3rd Cir. 1968), writs refused November 15, 1968. Defendants made timely objection to the admission of evidence of expenditures for maid services which exceeded those expressly itemized by plaintiff's petition. As we find no merit to *220 plaintiff's contention that maid services are "quasi medical services" which should be considered future medical expenses, we find that the trial court committed manifest error in failing to sustain defendants' objection. As plaintiffs' pleadings were not expanded through the admission of evidence of additional maid services, their relief is confined to that which they prayed for, and we reduce the award to plaintiffs for maid services from $1248.00 to $1,032.00.
For the above and foregoing reasons, the judgment of the trial court is amended so as to reduce the award to Shirley Ehrhardt from $15,500.00 to $10,000.00, and the award to plaintiffs for maid services from $1,248.00 to $1,032.00. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are to be paid by plaintiffs-appellees.
AMENDED AND AFFIRMED.
NOTES
[1] LSA-C.C. Art. 1934(3) provides in part:

"In the assessment of damages under this rule, as well as in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury, while in other cases they have none, but are bound to give such damages under the above rules as will fully indemnify the creditor, whenever the contract has been broken by the fault, negligence, fraud or bad faith of the debtor."