576 So.2d 1030 (1991)
O & M CONSTRUCTION, INC.
v.
STATE of Louisiana, DIVISION OF ADMINISTRATION.
No. CA 89 1136.
Court of Appeal of Louisiana, First Circuit.
March 5, 1991.
Rehearing Denied April 18, 1991.
Writ Denied June 14, 1991.
*1032 Craig L. Kaster, Baton Rouge, for plaintiff-appellant O & M Const., Inc.
Robert A. Barnett, New Orleans, for defendant-appellee State of La., etc.
Before COVINGTON, C.J., and LANIER and GONZALES, JJ.
LANIER, Judge.
This action is a suit in contract by a general contractor seeking damages and the balance withheld under a public building contract. Suit was filed by O & M Construction, Inc. (O & M)[1], the general contractor, against the State of Louisiana, Division of Administration (State), as owner of the building. The trial court found that (1) the architect was wrong in withholding approval of one payment application (No. 23), (2) the architect was correct in delaying issuance of the substantial completion certificate and in assessing $66,400 in liquidated damages for delay, (3) O & M's workmanship did not cause the paneling to come unstuck from the walls, (4) O & M failed to construct the organ room ceiling at a height of eleven feet as required by the plans, (5) O & M failed to use the proper size aggregate for the sidewalks and entrance way to the building, (6) the architect was wrong in withholding $9,000 as a credit for nine inches of fill not needed for the building and should have withheld only $1,670, (7) O & M was not entitled to damages for delays caused by the State *1033 and (8) O & M was not entitled to any other damages. The trial court awarded O & M[2] legal interest on $92,502.62 (amount of payment application No. 23) from July 31, 1985 to April 21, 1987, and $13,211 (amounts wrongfully withheld by the State) together with legal interest thereon from the date of judicial demand until paid. O & M took this devolutive appeal.[3]

FACTS
On July 28, 1983, O & M and Odis F. Haymon entered into a contract with the State to build Phase II of the Music School Renovation at Louisiana State University (LSU) in Baton Rouge, East Baton Rouge Parish, Louisiana. The contract provided that O & M and Haymon were to be paid $3,630,000 for performance of the contract. The project was to be completed within 420 days of its commencement date and in accordance with the plans and specifications provided by Miller, Smith & Champagne (MSC), the project's architects. Aetna Casualty & Surety Company (Aetna) provided the performance and payment bond. The contract provided for assessment of the sum of $800 per day as liquidated damages for each consecutive calendar day after the completion date that work remained incomplete.
On August 10, 1983, the State sent O & M and Haymon a notice that work was to be commenced on or before August 29, 1983, and fully completed by October 23, 1984, 420 consecutive calendar days after the commencement date. The original completion date of October 23, 1984, was extended by various change orders to August 2, 1985.
The parties proceeded with the project without major conflict until July of 1985. O & M submitted payment application No. 23 on July 3, 1985. MSC refused to approve payment of application No. 23 based on various alleged contractual deficiencies.
On July 30, 1985, O & M sent MSC a written request for inspection along with a list of items which remained outstanding in an effort to obtain a certificate of substantial completion. O'Neil Champagne of MSC inspected the building on August 20, 1985, and made a ten page punchlist dated August 22, 1985, containing items which needed correction or completion. On October 24, 1985, upon recommendation of MSC, the State issued a certificate of substantial completion for the project and assessed $66,400 (83 days at $800 per day) as liquidated damages for delay between August 2, 1985 and October 24, 1985.
On November 6, 1985, the State accepted the project keeping the normal five percent retainage, plus liquidated damages of $66,400 for delay and $147,000 above the normal retainage for completion of the punchlist items.
Disputes arose between the parties as to O & M's responsibility for correcting certain items on the punchlist. The State contracted with other parties for completion of the project and deducted the amounts spent for completion from the balance owed to O & M.
In April and October of 1987, the State paid O & M the balance due on the project less the above deductions.
This suit followed.

SUBSTANTIAL COMPLETION

(Assignment of error number 3)
O & M contends that the trial court erred in finding that the State was justified in withholding substantial completion status for the project until October 24, 1985, and in assessing $66,400 as liquidated damages for delay. It contends that the lack of handrails and air conditioning balance report are not valid reasons for refusing substantial completion status.
*1034 Section 01701, part 1.03 of the contract deals with substantial completion and provides the following:
A. When contractor considers work is substantially complete, submit written notice, with list of items to be completed or corrected.

B. Should Architect/Engineer inspection find Work is not substantially complete, he will promptly notify Contractor in writing, listing observed deficiencies.
C. Contractor shall remedy deficiencies and send a second written notice of substantial completion.
D. When Architect/Engineer finds Work is substantially complete he will prepare a Certificate of Substantial Completion in accordance with provisions of General Conditions.
(Emphasis added)
Article 9.8.1 of the general conditions of the contract provides as follows:
When the Contractor considers that the Work, or a designated portion thereof which is acceptable to the Owner, is substantially complete as defined in Subparagraph 8.1.3, the Contractor shall prepare for submission to the Architect a list of items to be completed or corrected. The failure to include any items on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents. When the Architect on the basis of an inspection determines that the Work or designated portion thereof is substantially complete, he will then prepare a Certificate of Substantial Completion which shall establish the Date of Substantial Completion, shall state the responsibilities of the Owner and the Contractor for security, maintenance, heat, utilities, damage to the Work, and insurance, and shall fix the time within which the Contractor shall complete the items listed therein. Warranties required by the Contract Documents shall commence on the Date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion. The Certificate of Substantial Completion shall be submitted to the Owner and the Contractor for their written acceptance of the responsibilities assigned to them in such Certificate.
(Emphasis added)
Article 8.1.3 of the general conditions of the contract defines the date of substantial completion as follows:
The Date of Substantial Completion of the Work or designated portion thereof is the Date certified by the Architect when construction is sufficiently complete, in accordance with the Contract Documents, so the Owner can occupy or utilize the Work or designated portion thereof for the use for which it is intended.

(Emphasis added)
Contracts have the effect of law upon the parties, and the courts are bound to give legal effect to all contracts according to the true intent of the parties. This intent is determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences. La. C.C. arts. 1901 and 1945 (now La.C.C. arts. 1983, 2045 and 2046)[4]; First National Bank of Commerce v. City of New Orleans, 555 So.2d 1345 (La.1990); Leenerts Farms, Inc. v. Rogers, 421 So.2d 216 (La. 1982); Oberfell v. Oberfell, 516 So.2d 424 (La.App. 1st Cir. 1987). They must be interpreted in a commonsense fashion, giving to the words of the contract their common and usual significance. La.C.C. art. 1946 (now La.C.C. art. 2047); Lambert v. Maryland Casualty Company, 418 So.2d 553 (La.1982); Fishbein v. Bankston, 426 So.2d 649 (La.App. 1st Cir.1982). All clauses of a contract are to be interpreted the one by the other, giving to each the sense that results from the entire act. La.C.C. art. 1955 (now La.C.C. art. 2050); John Bailey Contractor, Inc. v. State, Department of *1035 Transportation and Development, 439 So.2d 1055 (La.1983); Pendleton v. Shell Oil Company, 408 So.2d 1341 (La.1982). A cardinal rule in construction of contracts is that the contract must be viewed as a whole and, if possible, practical effect given to all parts, according to each the sense that results from the entire agreement so as to avoid neutralizing or ignoring any of them or treating them as surplusage. John Bailey Contractor, Inc. v. State, Department of Transportation and Development, 439 So.2d at 1058; Lambert v. Maryland Casualty Company, 418 So.2d at 559; Fishbein v. Bankston, 426 So.2d at 651.
Under Louisiana law, a building contractor is entitled to recover the contract price even though defects or omissions are present when he has "substantially performed" the building contract.[5] "Substantial performance" in such case means that the construction is fit for the purpose intended despite the deficiencies. This is a factual determination to be made by the trial court. Factors bearing on this factual determination include: the extent of the defect or non-performance, the degree to which the purpose of the contract is defeated, the ease of correction, and the use or benefit to the owner of the work performed. Airco Refrigeration Service, Inc. v. Fink, 242 La. 73, 134 So.2d 880 (1961); Orgeron v. Dobkowski, 476 So.2d 458 (La.App. 1st Cir.1985); Anderson v. Green, 454 So.2d 200 (La.App. 1st Cir.), writ denied, 459 So.2d 539 (La.1984). The burden of proving substantial performance is on the contractor trying to recover the balance due on the contract. Huguet v. Musso Partnership, 509 So.2d 91 (La.App. 1st Cir.), writ denied, 512 So.2d 462 (La. 1987).
In this case, the State and O & M contractually agreed to the meaning of substantial completion. Their definition of substantial completion is found in Article 8.1.3 of the general conditions, and is controlling between them. This definition varies from the jurisprudential definition. O & M has the burden of proving that substantial completion was attained before August 2, 1985, the termination date of the contract, as alleged in its petition.
The record shows that on July 30, 1985, Mike Schulz, O & M's treasurer, sent Clayton Smith of MSC a written request for an inspection for substantial completion along with a list of items in need of completion. The parties prior to this point had spoken about such an inspection, but this was the first written request which complied with Section 01701, Part 1.03(A) of the contract pertaining to close out procedures and Article 9.8.1 of the general conditions. On August 20, 1985, O'Neil Champagne of MSC conducted the requested inspection and compiled a ten page punchlist of items needing correction or completion.
On September 24, 1985, Schulz sent another letter to MSC containing a list of items to be completed and again requesting substantial completion status. On September 30, 1985, Smith wrote O & M a letter stating that substantial completion would be granted and liquidated damages would cease when the handrails were installed and he received the air conditioning balance report. On October 8, 1985, Smith wrote a letter to LSU which stated that the balance report had been received from O & M and the handrails were being installed. It recommended that liquidated damages cease on October 7, 1985. On October 24, 1985, Smith wrote a letter to the State enclosing a copy of the fire marshal's inspection report made that morning and recommended substantial completion status. Liquidated damages were assessed by the State from August 2, 1985 to October 24, 1985.
Smith testified he told O & M that substantial completion would not be certified until the air conditioning system was balanced and he received the balance report and the handrails were installed in the building. He stated that handrails are required by law and the State Fire Marshal would not approve occupancy of the building until the handrails were installed. He stated that a balanced air conditioning system and handrails were needed before the *1036 owner could occupy the building for its intended use.
David Assaf, a consulting mechanical engineer for MSC, testified that he inspected the building and made a mechanical punchlist dated August 26, 1985. His inspection revealed that there were numerous problems with the air conditioning system. Several units were not operating and he could not check the system to see if it was operating properly. In a letter dated September 5, 1985, to MSC, he stated that the majority of the thermostats in the building were of the wrong type causing the system to operate improperly and that balancing the system had not been done. He received the balance report on September 27, 1985, but found that it was incomplete. On October 15, 1985, he conducted another inspection of the building and compiled a punchlist which contained the same items as on the August 26, 1985 punchlist. He stated that at this time the air conditioning system still was not functioning properly.
William Holstein, the balancing subcontractor, testified that balancing of the air conditioning system began on July 8, 1985, and was completed in the early part of August of 1985. He stated that generally, balancing work is done after a project is substantially completed. He stated that the balancing report was of the same format as submitted on other LSU projects he had done. He stated that the air conditioning system was complete when they balanced it. He did not inform MSC or LSU that the system was balanced. He stated that MSC and LSU did not know the system was balanced until they received the balance report on September 27, 1985.
Carl Fenn, O & M's project manager testified that he left the project in mid-July of 1985, and it was substantially complete at that time.
Michael Myers, O & M's expert in cost analysis and construction scheduling, testified that he monitored progress of the project and it was substantially complete as of July 30, 1985. He agreed that O & M had not complied with the contract provisions for requesting an inspection for substantial completion until the July 30, 1985 written request by Schulz. He stated that normally the balancing report does not hold up substantial completion. He remembers the air conditioning system working in September of 1985.
Schulz testified that the air conditioning system was balanced in July and August of 1985. He stated that the balancing subcontractor usually comes on the project after substantial completion. He said the system was balanced by August of 1985 and the balancing report completed several weeks later. He did not know lack of a balancing report was holding up substantial completion because it usually did not. He knew that the handrails were missing from the building but did not know this fact held up substantial completion. He knew that handrails were required by state law (fire code) and that the fire marshal would not certify occupancy until they were installed. He felt the project was substantially complete in July of 1985.
Champagne testified that an accumulation of things prevented substantial completion in July and August of 1985. He stated that the air conditioning system must be functioning and balanced before a building is ready for occupancy. He said the balance report submitted on September 27, 1985, was incomplete. He said that you cannot occupy a building without handrails because open stairs are a hazard. He said that the fire marshal would not allow occupancy of the building without handrails, and without the fire marshal's certificate of occupancy, he could not recommend substantial completion.
The trial court found that O & M's failure to complete the punchlist provided by MSC resulted in a delay for substantial completion. It also found that lack of handrails was a valid reason for refusing substantial completion and that O & M should have known of the minimum requirements of the fire marshal before a certificate of occupancy could be issued by him. After a review of the record and the contract provisions, we cannot say that the trial court was manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La.1989).
*1037 This assignment of error is without merit.

PUTTING IN DEFAULT AS A PREREQUISITE TO LIQUIDATED DAMAGES

(Assignment of error number 4)
O & M contends the trial court erred in allowing the State to assess liquidated damages for delay when the State did not place it in default.
A penal clause is a secondary obligation, entered into for the purpose of enforcing the performance of a primary obligation. La.C.C. art. 2117 (now La.C.C. art. 2005). Whether the principal obligation contains, or does not contain, a term in which it is to be fulfilled, the penalty is forfeited only when he who has obligated himself either to deliver, to take or to do, is in default. La.C.C. art. 2126 (now La.C.C. art. 2010). A contractor's failure to complete a building contract within the time specified in the contract constitutes a passive breach, and a putting in default is a condition precedent to the recovery of liquidated damages for the contractor's delay in completion unless (1) by the terms of the contract a putting in default is waived, (2) by stipulation in the contract or by the nature and circumstances of the agreement time is of the essence thereof, or (3) a putting in default is excused by some act of the obligor which would render it a vain and useless thing. Southern Construction Company v. Housing Authority of City of Opelousas, 250 La. 569, 197 So.2d 628 (1967); Haffner & Taylor v. Perloff, 174 La. 687, 141 So. 377 (1932); Herman Bros. v. Troxler, 166 La. 587, 117 So. 727 (1928); Godchaux v. Hyde, 126 La. 187, 52 So. 269 (1910); North Central Utilities, Inc. v. East Columbia Water District, 497 So.2d 326 (La.App. 2nd Cir.1986), writ denied, 501 So.2d 229 (La.1987); Ray v. Peeples, 387 So.2d 1303 (La.App. 1st Cir.1980); C-B Construction Company, Inc. v. Kilpatrick, 366 So.2d 990 (La.App. 1st Cir. 1978); Brooks v. Neyrey, 167 So.2d 400 (La.App. 4th Cir.1964); Gulotta v. Swinney, 143 So.2d 775 (La.App. 1st Cir.1962); 7 S. Litvinoff, Louisiana Civil Law Treatise: Obligations, Sections 219 and 241, pp. 403 and 453 (West 1975); Cf. Barber Brothers Contracting Company, Inc. v. Chet Homes, Inc., 393 So.2d 352 (La.App. 1st Cir.1980), writ refused, 396 So.2d 921 (La.1981). Whether time is of the essence is not always easily determined, and often the answer to the question depends not upon the terms of the contract itself, but upon the extraneous circumstances and facts and upon how the parties themselves looked upon the importance or unimportance of the time element. North Central Utilities, Inc. v. East Columbia Water District, 497 So.2d at 330; Binnings Construction Company v. Louisiana Life Insurance Company, 139 So.2d 561 (La.App. 4th Cir.1962); Williams Lumber Co., Inc. v. Stewart Gast & Bro., 21 So.2d 773 (La. App.Orl.Cir.1945).
The contract provisions dealing with stipulated damages are found throughout the bid proposal instructions and forms and the supplementary conditions, all of which are incorporated into the contract by article 1.1.1 of the general and supplementary conditions. In the instructions to bidders, article 9.1 provides as follows:
The completion of the Contract must be within the time stated on the Proposal Form, subject to such extensions as may be granted under Paragraph 8.3, Delays and Extensions of Time in the General Conditions, or the Contractor will be subject to pay to the Owner Liquidated Damages in the amount as stated on the Proposal Form.
(Emphasis added)
The bid proposal form provides as follows:
COMPLETION TIME: The bidder hereby agrees to commence work under this contract on a date specified in a written "Notice to Proceed" by the Owner and to fully complete the project within 420 consecutive calendar days thereafter, or within the time as may be extended as stipulated in the Contract Documents.
LIQUIDATED DAMAGES: The bidder hereby also agrees to pay as liquidated damages, the sum of Eight Hundred Dollars ($800.00) for each consecutive calendar day which the work is not *1038 complete beginning with the first day beyond the completion time stated above.
Supplementary conditions article 8.2.1 provides as follows:

Time is of the essence and completion of the work must be within the time stated in the contract, subject to such extensions as may be granted under section 8.3. The Contractor agrees to commence work not later than ten days after the date of Written Notice to Proceed from the Owner and to substantially complete the project within the time stated in the Contract. The Owner will suffer financial loss if the Project is not substantially complete in the time set forth in the Contract Documents. The Contractor and his Surety shall be liable for and shall pay to the Owner the sum stated in the Contract Documents as fixed, agreed and liquidated damages for each consecutive calendar day (Saturdays, Sundays and holidays included) of delay until the work is substantially complete.
(Emphasis added)
The notice to proceed states the following:
You are hereby notified to commence work on the referenced contract on or before August 29, 1983 and are to fully complete the work (on or before October 23, 1984) within 420 consecutive calendar days thereafter. Your contract completion date is therefore October 23, 1984. The contract provides for assessment of the sum of $800.00 as liquidated damages from each consecutive calendar day after the above established contract completion date that the work remains incomplete.
The contract completion date was extended by a series of change orders from October 23, 1984 to August 2, 1985. The project was found to be substantially complete on October 24, 1985, 83 days after its scheduled completion date. Liquidated damages in the amount of $66,400 were assessed against O & M for delay in completion of the contract.
The record does not reveal that O & M was ever placed in default by the State. However, the contract documents state that time is of the essence in completion of the project and that the project must be completed within the time specified. When the terms of a contract are clear, the court will enforce the contract as written, provided the agreement is not contrary to good morals or public policy. First National Bank of Commerce v. City of New Orleans, 555 So.2d at 1348. The parties clearly agreed that time was of the essence in the building of the music school building, and this court will enforce the contract as written.
The circumstances surrounding this project also support a finding that time was of the essence. The contract was for the building of a new music school building at LSU. The project was scheduled to be completed on August 2, 1985, just prior to the beginning of the fall school semester. It is obvious that the State contemplated having the new school building completed prior to the new school year. The record shows that there was limited space in the old music building and the music department was anxious to occupy the new building.
Since time was of the essence in the project, a putting in default by the State was unnecessary for recovery of liquidated damages for delay. The trial court was correct in denying O & M any relief from the assessment of liquidated damages by the State. See for example C-B Construction Company, Inc. v. Kilpatrick, 366 So.2d at 993; Pamper Corporation v. Town of Marksville, 208 So.2d 715 (La. App. 3rd Cir.), writ refused, 252 La. 271, 210 So.2d 509 (La.1968).
This assignment of error is without merit.[6]

*1039 RECOVERY FOR DEFECTIVE WORKMANSHIP

(Assignments of error numbers 5, 6 and 7)
O & M contends the trial court erred in allowing the State to withhold money from it for repair work to the organ room ceiling, the recital hall paneling, and the aggregate walkways and entrance. O & M asserts the State did not prove its work was defective and failed to substantiate the amounts spent in correcting the allegedly defective work. It also contends the State failed to substantiate the amounts spent in correcting the punchlist items.
The contract between O & M and the State is a lease of labor and industry for work by the job. La.C.C. arts. 2745(3), 2756 and 2757. Such a contract is commonly called a building or construction contract. The contractor (builder) in such a contract has an implied duty to perform in a workmanlike manner free from defects attributable to either faulty materials or poor workmanship. La.C.C. art. 2769; Huguet v. Musso Partnership, 509 So.2d at 93; Cell-O-Mar, Inc. v. Gros, 479 So.2d 386 (La.App. 1st Cir.1985), writs denied, 481 So.2d 1332, 1333 (La.1986); Harris v. Best of America, Inc., 466 So.2d 1309 (La. App. 1st Cir.), writ denied, 470 So.2d 121 (La.1985). The contractor is liable for damages if it is shown that he did not possess the necessary skill, efficiency or knowledge, or did not exercise ordinary care in the performance of the work or in selection of suitable materials and equipment. A contractor is not liable for the destruction, deterioration or defects of a thing he builds if the destruction, deterioration or defects resulted from plans and/or specifications furnished to him that he was obliged to follow. However, even though a contractor is required to follow plans and/or specifications furnished to him, he can still be liable for damages if the destruction, deterioration or defects were his fault and not related to the plans and/or specifications, or if he had a justifiable reason to believe that adherence to the plans and/or specifications would create a hazardous condition. Cell-O-Mar, Inc. v. Gros, 479 So.2d at 391.
A contractor is obligated to perform in accordance with the contract plans and specifications. Biedenharn v. Waters, 169 La. 1006, 126 So. 508 (1930); Sarrazin v. Alfred A. Adams & Co., 110 La. 124, 34 So. 301 (1902); Karam v. DeSoto, 520 So.2d 1032 (La.App. 3rd Cir.1987); King Brothers Building Contractors, Inc. v. McCullen, 393 So.2d 413 (La.App. 1st Cir. 1980); West Bank Steel Erectors Corporation v. Charles Carter & Company, 248 So.2d 52 (La.App. 1st Cir. 1971). Where remedial work is required to complete a project in accordance with plans and specifications, the cost of such remedial work must be borne by the party at fault. Karam v. DeSoto, 520 So.2d at 1034; Herlitz Construction Company, Inc. v. Clegg Concrete, Incorporated, 378 So.2d 1002 (La.App. 1st Cir.1979); Alumaglass Corp. v. Administratrix of Succession of Kendrick, 303 So.2d 911 (La.App. 1st Cir.1974), writ denied, 307 So.2d 632 (La.1975).
A party seeking to have the contract price reduced by an amount to perfect or complete work done under the contract bears the burden of proving the necessity of such perfection or completion and its cost. Finishers Drywall, Inc. v. B & G Realty, Inc., 516 So.2d 420 (La.App. 1st Cir.1987); Rudy Brown Builders, Inc. v. St. Bernard Linen Service, Inc., 428 So.2d 534 (La.App. 4th Cir.1983)

Recital Hall Paneling
On April 1, 1986, Miremont-Schoonmaker Construction Company (Miremont) entered into a contract with the State to perform emergency repairs to the paneling in the recital hall of the music building for a price of $978.07. On June 30, 1987, Nicholas Blanc, Jr., a general contractor, entered into a contract with the State to remove and replace the paneling in the recital hall for a price of $5,881. Both *1040 contracts were introduced into evidence by the State. These contractors were employed because a large number of the panels in the recital hall had pulled away from the wall.
The project specifications required that the 4' × 4' plywood panels be glued to the wall. O & M attributed the pulling away problem to the weight of the panels and an error by MSC in specifying the glue for the panels. Blanc felt the problem was either panel weight or excessive humidity in the building. MSC attributed the problem to O & M's failure to prime the back of the panels.
The trial court held that O & M's defective workmanship was not the cause of the paneling not adhering to the walls of the recital hall and refused to allow the State to withhold the $5,881 contract price for repairs by Blanc. This portion of the judgment was not appealed by the State and is now final. The trial court, however, did not discuss the amount withheld by the State for emergency repairs to the paneling by Miremont. Since the trial court found that the problem with the paneling was not caused by O & M's workmanship, it should have refused to allow the State to withhold the amount of the Miremont contract, $978.07. The judgment will be amended to award O & M $978.07.

Organ Room Ceiling
O & M contends the State is not entitled to withhold money from it for organ room repairs because the return air duct in the organ room was moved with the consent of the mechanical engineer and a ceiling height of eleven feet throughout the organ room was unobtainable.
The plans and specifications call for an eleven foot ceiling height throughout the organ room. This height is required because of a special organ which was to be placed in this room. It is undisputed that O & M built the ceiling in the organ room at a height of ten feet six inches.
The State contracted with Guitreau's Construction & Consulting Company (Guitreau) to raise the ceiling of the organ room to eleven feet. This portion of Guitreau's contract amounted to $5,500. The contract was introduced into evidence by the State.
Smith testified that the plans and specifications require the organ room ceiling to be eleven feet high. He stated that the height could be attained if the plans and specifications were followed. He said that the double gypsum board ceiling was installed at a lower height than required by the plans and this is the cause of the lower ceiling height. He was never contacted by anyone from O & M prior to the ceiling being installed to discuss a reduced ceiling height. He never gave O & M written permission to put the ceiling at a height of less than eleven feet. He stated that Guitreau was allowed to raise only a section of the organ room ceiling to eleven feet. He never denied O & M the opportunity to correct the problem. He measured the ceiling height in the corrected portion of the organ room, and it was above eleven feet.
Gary Guitreau testified that he made the corrections to the organ room ceiling. He raised a portion of the organ room ceiling to a height of ten feet eleven inches. He also rerouted the return air duct. He was paid $5,500 for the work in the organ room.
Assaf testified that he never had a meeting with Tony Romero, the duct subcontractor, and Fenn about the ceiling height in the organ room or movement of the return air duct. He only remembered meeting about the organ room ceiling height towards the end of the project after the ceiling had been installed. He measured the organ room ceiling height, and it was ten feet six inches. He inspected O & M's ceiling work and found that the double gypsum board ceiling was installed lower than specified by the plans. He stated that the eleven foot ceiling height could easily have been attained if the plans would have been followed. He did not authorize anyone to move any of the duct work in the organ room. He stated any change in duct work had to be approved by MSC.
Fenn testified that he, Romero and Assaf met before the duct work began to discuss problems with one duct in the organ room *1041 and problems with the ceiling height in the organ room. He said Assaf approved the change in the duct location in an attempt to get the organ room ceiling as high as possible. He said the organ room ceiling was built as high as possible and this was approved by Assaf. He thought verbal approval was sufficient even though the specifications require written approval by the architect. He did not get written approval for any changes in the organ room from MSC. He didn't think the eleven foot ceiling height was possible as designed.
Romero testified that the duct in the organ room could not be installed according to the plans and specifications. He said the problem was resolved in a meeting in the organ room which was attended by Assaf. He said Assaf approved the change in the duct work.
Schulz testified that the eleven foot ceiling height in the organ room could not be obtained. He received approval from MSC to get the ceiling height as high as possible. He said that ten feet six inches is as high as the ceiling would go according to the plans. He didn't get written authorization from MSC for changes when problems developed because it was too time consuming.
Champagne testified that the plans for the organ room called for an eleven foot ceiling height which was not obtained by O & M because it did not follow the plans and installed the double gypsum board too low. He said if O & M would have followed the plans as designed, the eleven foot ceiling height could have been obtained.
The trial court found that the plans required an eleven foot ceiling height in the organ room and that O & M completed the room with a ceiling height of less than eleven feet. The trial court did not decide if an error existed with MSC's plans but found that O & M failed to notify MSC prior to relocating the duct work. It found that O & M was responsible for the defect in the organ room ceiling and the State was entitled to withhold funds for the remedial work.
After a review of the record, we cannot say that the trial court was manifestly erroneous. Rosell v. ESCO, 549 So.2d at 844-845; See for example, King Brothers Building Contractors, Inc. v. McCullen, 393 So.2d at 415.

Exposed Aggregate Walkways and Entrance
O & M contends the trial court erred in allowing the State to withhold money from it for replacement of the exposed aggregate and asserts its workmanship was not defective and the State never complained about the size of the aggregate used by it.
Section 03301, Part 3.13(B) of the contract specifications dealing with concrete work provides that the "[e]xposed aggregate finish, where called for on the Plans, shall be accomplished by using a special pea gravel mix using size number 8 coarse aggregate." Part 1.04(C) of Section 03301 contains a reference to the American Society for Testing and Materials (ASTM) Standard C-33 dealing with concrete aggregate. Number 8 coarse aggregate as defined by ASTM standards puts the size of the aggregate at 3/8 inch or smaller.
The plans call for a small exposed aggregate walkway in the rear of the building and a large aggregate entrance in the front of the building. O & M poured the relatively small back portion sometime in late June or early July of 1985. Even though this pour contained the wrong size aggregate (¾ inch), Champagne inspected it and said it was acceptable because the size of the pebbles was not pronounced. About three weeks later, O & M poured the front portion of the exposed aggregate. Champagne inspected the front portion and found it was unacceptable. O & M refused to replace the exposed aggregate, so the State contracted with Guitreau to replace all of the exposed aggregate for a contract price of $22,500. This contract was introduced into evidence by the State.
Smith testified that O & M used the wrong size aggregate on all the exposed aggregate walkways. He stated the pour was of an unsatisfactory quality because it was not to proper lines and grades. He stated it held water and mud on its surface. *1042 He said that O & M should have been aware of the plans and specifications for exposed aggregate and followed them. He said O & M attempted to repair some of the aggregate, but it was still unacceptable. O & M was told to replace all of the aggregate. He stated that the back portion of the aggregate constituted 15% of the total exposed aggregate on the project.
Guitreau testified he contracted with the State to replace the exposed aggregate for $22,500 and did, in fact, remove and replace all exposed aggregate on the project. He used 3/8 inch or smaller aggregate in his pour as required by the plans and specifications. He observed no structural failure in the aggregate he removed. He never witnessed any water retention by the old aggregate because the surface was never wet, but did notice that O & M's pour used ¾ inch aggregate.
Fenn testified that O & M poured the first aggregate in the beginning of June of 1985, and finished all of the aggregate by the middle of July of 1985. He said they started in the back of the building and worked towards the front entrances. The back section was poured three weeks before the front section. He said that Champagne inspected the pours and never said anything about the use of the wrong size aggregate. He said the pours were made to the proper grades.
Schulz testified that the back portion of the aggregate was poured in the early part of June of 1985 and the front portion was poured in the early part of July of 1985. He stated that MSC did not complain about the rear pour. He stated that ¾ inch aggregate was used in both pours. He testified that Champagne inspected the front pour and requested that only a small section of the front pour be replaced. He stated that Champagne never mentioned anything about the wrong size aggregate or water puddles. He disagreed with MSC's request to replace all of the exposed aggregate because it was not defective. He was not made aware of the causes for rejecting the aggregate until March of 1986.
Champagne testified that the back pour contained the wrong size aggregate but was fairly acceptable. He testified that the front pour was unacceptable. It was not poured to proper lines and grades or within accepted tolerances. He said there were depressions on the surface which held water and areas of gray on the surface indicating cementious materials. He said the surface was not properly washed with acid. He said the specifications called for number 8 course aggregate or 3/8 inch aggregate, but O & M used ¾ inch aggregate instead. He stated O & M attempted to repair the aggregate but it was still unacceptable.
The trial court found that the specifications called for number 8 coarse aggregate for the exposed aggregate walkways and entrance, but that O & M poured concrete with the wrong aggregate size. The trial court also found that it was O & M's responsibility to inquire of MSC if it did not understand the specifications and it was not free to do as it wished. In essence, the trial court found O & M's exposed aggregate defective for not complying with specifications and allowed the State to withhold the cost of replacement.
After a review of the record, we find the trial court was correct. See for example, Rudy Brown Builders, Inc. v. St. Bernard Linen Service, Inc., 428 So.2d at 535-536; Lofton v. Don J. Trahan, Inc., 399 So.2d 818 (La.App. 1st Cir.1981); Wetmore v. Blueridge, Inc., 391 So.2d 951 (La.App. 4th Cir.1980); Toepfer v. Thionville, 299 So.2d 415 (La.App. 4th Cir.1974).

Punchlist Items
O & M contends the trial court erred in allowing the State to withhold money from it for completion of the punchlist items where the State did not prove the items on the punchlist needed repair and did not substantiate the amount spent to correct these items.
On September 8, 1987, the State entered into a contract with Moore Construction, Inc. (Moore) in the amount of $10,115 for replacement of acoustical doors and completion of punchlist and warranty items.
*1043 This contract was introduced into evidence by the State.
Throughout the record, the witnesses discussed several different punchlists and the items included on these punchlists. All of these punchlists were introduced into evidence at trial. The record shows which items were corrected by O & M and which items were corrected by Moore upon O & M's refusal to correct.
The trial court found that the payments made to various companies to complete the punchlist were proper. After a review of the record, we cannot say that the trial court erred in this finding.

Conclusion
As stated above, the trial court found O & M's work defective and allowed the State to withhold the amounts needed to correct this defective work. A review of the record supports the trial court's findings. Except for the omission dealing with the paneling, the trial court's findings are correct.
These assignments of error are without merit.

TIME EXTENSIONS AND RELATED DELAY DAMAGES

(Assignment of error number 8)
O & M contends the trial court erred in not granting it an extension of time and damages for the delays to the project caused by the State. It claims it is entitled to $63,637 as damages for delays caused by change orders to the project (agreed delays) and $44,691.83 as damages for delays caused by other related problems with the project (disputed delays).

Time Extensions
O & M contends that it is entitled to a 47 day extension to the contract because of delays to the project caused by the State. O & M claims (1) a 13 day extension of time because of a phone line repair, (2) a two day extension of time because of conflicts with duct work throughout the project, (3) a two day extension of time because of a reduced lay down area and (4) a 30 day extension of time because of problems with access to the job site.
Articles 8.3.1 and 8.3.2 of the general conditions of the contract deal with delays and extensions of time and provide as follows:
8.3.1 If the Contractor is delayed at any time in the progress of the Work by any act or neglect of the Owner or the Architect, or by any employee of either, or by any separate contractor employed by the Owner, or by changes ordered in the Work, or by labor disputes, fire, unusual delay in transportation, adverse weather conditions not reasonably anticipatable, unavoidable casualties, or any causes beyond the Contractor's control, or by delay authorized by the Owner pending arbitration, or by any other cause which the Architect determines may justify the delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine.
8.3.2 Any claim for extension of time shall be made in writing to the Architect not more than twenty days after the commencement of the delay; otherwise it shall be waived. In the case of a continuing delay only one claim is necessary. The Contractor shall provide an estimate of the probable effect of such delay on the progress of the Work.
(Emphasis added)
Smith testified that he could not remember O & M having problems with access to the project even though the fence around the building was closer to the building than originally planned. He said O & M never came to him to make claims for extra time or costs, other than the twelve change orders that were issued. He stated that O & M was not delayed 13 days by the phone line rerouting because it was doing other foundation work at this time. He was not aware of any delay caused by access to the project site, reduction in the lay down area or by conflicts with duct work. He never received any request for extensions of time as related to these alleged delays.
*1044 Assaf testified that he was not aware of any duct work problems which would justify a two day extension. He was not aware of a request for an extension of time by O & M because of duct work conflicts.
Myers testified he looked at the progress of the project in terms of money spent monthly in relation to the total cost of the project. He used percentages to figure out delays in the project. He stated there was a 13 day delay to the project from April 27 to May 10, 1984, because of repair of a broken phone line. He said footings in the area of the phone line could not be drilled. He stated there was a two day delay to the project caused by reduction in the size of the lay down area. This is the area where supplies are dropped off and stored. He stated the project was delayed 30 days because of problems with access to the job site. He stated that the fence around the project was closer to the building than expected and this caused problems getting equipment and supplies around the building. He also stated O & M was restricted to use of certain areas to enter the fence which caused inconvenience. He also felt that duct conflicts delayed the project for two days. He stated the causes of the delays involved the critical path of the project. He admitted that during the claimed delays work was still taking place on the project. He stated he based his estimates of delay on payment certificates and not on actual work records. He also included weekends in his calculation even if they were not worked. He felt the delay for access to the job site took place in January and February of 1985, because the drywall subcontractor and roofing subcontractor did not bill the project in an increasing fashion during those months. Their work constituted a large portion of the total project. He said if a party did not have work to do at the time of low billing, it would effect his delay calculation. He admitted that weather did delay the job's progress in January and February of 1985. He admitted that 15% of the total project work was completed in January and February of 1985. He also admitted that as a subcontractor neared completion of his work, his progress would slow and he would bill less. He said that even if a subcontractor said he was not actually delayed by the alleged problems, his opinion as to the amount of delay would be the same.
Schulz testified that problems with access to the job site delayed them substantially because they could not get equipment and supplies around the building as needed. He said they were delayed at least 30 days due to access problems. He agreed with Myers as to the extent of delays for the telephone line problem and duct conflict problem. He also stated they had problems in storing materials at the job which caused a delay of at least two days. He applied for extensions of time on numerous occasions but was turned down.
Lloyd Moreau, the drywall subcontractor, testified that he was never delayed in his job during the entire project. His work increased in January and February of 1985, and he was never held up by anything. His job was critical to the project because he did almost all of the interior work to the building. He stated that Myers' chart for January and February of 1985 was incorrect. He stated that in December of 1984, his accountant overbilled the project by about $49,000, so he did not send a bill in January of 1985. He stated that the December of 1984 certificate for payment showed more work being done than actually was done.
Champagne testified that O & M was not delayed on the project because of a reduced lay down area. He stated that O & M was informed during the bid conference of the situations dealing with project access and parking. He stated that O & M was not delayed by the telephone line repair because it continued to drill and pour footings during this time. He stated that the project was not delayed due to duct conflicts. He said O & M was not delayed by lack of access to the project. He said no written requests for extensions of time were made for these alleged delays by O & M.
The trial court found that O & M was not entitled to additional contract days because *1045 previous change orders had provided additional days to it.
The testimony concerning the alleged delays is conflicting. It is apparent that the trial court believed that either O & M was not actually delayed as alleged or that it waived its right to an extension of time by not timely filing a written request for such extension. We cannot say that the trial court was manifestly erroneous in its finding.[7]Rosell v. ESCO, 549 So.2d at 845.

Related Delay Damages
O & M contends it is entitled to indirect costs as damages for delay related to change orders six and seven dealing with the lobby extension and change order ten dealing with the audio system.
Article 12 of the general conditions deals with change in the work and provides as follows:
12.1 CHANGE ORDERS
12.1.1 A Change Order is a written order to the Contractor signed by the Owner and the Architect, issued after execution of the Contract, authorizing a change in the Work or an adjustment in the Contract Sum or the Contract Time. The Contract Sum and the Contract Time may be changed only by Change Order. A Change Order signed by the Contractor indicates his agreement therewith, including the adjustment in the Contract Sum or the Contract Time.

12.1.2 The Owner, without invalidating the Contract, may order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and the Contract Time being adjusted accordingly. All such changes in the Work shall be authorized by Change Order, and shall be performed under the applicable conditions of the Contract Documents.
12.1.3 The cost to the Owner resulting from a Change in the Work shall be the sum of:
1. Material and labor cost
2. Subcontract costs
3. Overhead and profit.
12.1.3.1 Before a Change Order is prepared, the Contractor shall provide and deliver to the Architect the following information, not subject to waiver, within ten (10) days after being notified to prepare said Change Order:
1. An itemized list of material and labor costs for Subcontractor's work including quantities and unit costs for each item of labor and each item of material.
2. An itemized list of material and labor costs for Contractor's work including quantities and unit costs for each item of labor and each item of material.
3. Overhead and profit shall be computed by one of the following methods:
a) When all of the work is General Contract work; 15% of the cost of the work as defined hereafter.
b) When the work is all Subcontract work; 15% of the cost of the work for Subcontractor's Overhead and Profit plus 10% of the cost of the work for General Contractor's Overhead and Profit.
c) When the work is a combination of General Contract work and Subcontract work; 15% of the cost of subcontract work for Subcontractor's Overhead and Profit plus 10% of the cost of the subcontract work for General Contractor's Overhead and Profit plus 15% of the cost of general contract work for General Contractor's Overhead and Profit.
. . . . .
12.1.3.3 Cost of the work for the purpose of Change Orders shall be costs necessarily incurred in performance of the work and paid by the Contractor which shall consist of:
1. Wages paid.
2. Cost of all materials and supplies.

*1046 3. Cost of necessary machinery and equipment.
4. Cost of applicable taxes, insurance, fringe benefits, unemployment compensation, social security, old age and bond premiums.
5. Any other documented costs.
12.1.3.4 Subcontract cost shall consist of the items in 12.1.3.3 above plus Overhead and Profit as defined in 12.1.3.1.
12.1.3.5 Cost of the work whether General Contract cost or Subcontract cost shall not apply to the following:
1. Salaries or other compensation of the Contractor's personnel at the Contractor's principal office and branch offices.
2. Expenses of the Contractor's principal office, branch office and the field office.
3. Any part of the Contractor's capital expenses, including interest on the Contractor's capital employed for the work.
4. Overhead and general expenses of any kind or the cost of any item not specifically and expressly included above in Cost of Work.
. . . . .
12.3 CLAIMS FOR ADDITIONAL COST
12.3.1 If the Contractor wishes to make a claim for an increase in the Contract Sum, he shall give the Architect written notice thereof within twenty days after the occurrence of the event giving rise to such claim. This notice shall be given by the Contractor before proceeding to execute the Work, except in an emergency endangering life or property in which case the Contractor shall proceed in accordance with Paragraph 10.3. No such claim shall be valid unless so made. If the Owner and the Contractor cannot agree on the amount of the adjustment in the Contract Sum, it shall be determined by the Architect. Any change in the Contract Sum resulting from such claim shall be authorized by Change Order.
. . . . .
(Emphasis added)
The evidence shows that change orders six and seven are both dated October 15, 1984, and deal with extension of the lobby. Change order six increases the contract sum by $22,438.82 and extends the contract by 30 days. Change order seven increases the contract sum by $17,094.03. Change order ten is dated April 17, 1985, and deals with audio system changes. It increases the contract sum by $27,191.05 and extends the contract by 45 days. All of these change orders were signed by someone from MSC and Schulz from O & M.
Myers testified that a change order addresses only the direct cost of changing the work and extension of time to the contract completion date. Direct cost includes additional material, labor, and equipment costs and profit and overhead. He stated profit and overhead is the cost of processing and executing the change such as soliciting bids for the revised work, changing material orders, coordinating subcontractors, changing records, and negotiating the change with the owner. He stated that a change order does not include indirect or time-related cost because they have not been incurred yet. He explained that when a change order grants an extension of time, this predetermined amount of time is relief from the possible assessment of liquidated damages. At the time the extension is granted, the parties are not sure if the additional time is required. Thus, it would be inappropriate to grant an amount for indirect cost and include it in the change order before the costs are actually incurred. These indirect costs are not incurred unless the additional time is actually used. He stated his view is supported by the contract documents and MSC's interpretation of these documents. He stated that Smith told O & M it had to sue the State if it wanted to recover indirect cost. He stated his view did not allow O & M to recover twice for overhead and profit.
Myers calculated his estimated indirect damages from summary accounting documents he received from Schulz. He admitted that he verified only one or two entries on these summary accounting documents *1047 with O & M's actual accounting records. He admitted that if the amounts on these summaries were incorrect, his damage calculation would be incorrect. He used a figure of $491.93 per day as the cost of the field office at the music school project. He multiplied this figure by the 75 additional days granted in change orders six, seven and ten to get a total of $36,894.75, as on-site indirect or time-related cost. He calculated the main office cost attributable to the music school project by figuring the percentage of O & M's total billing attributable to the music school project and then multiplying the total main office cost by this percentage. For change orders six and seven, he stated the delay occurred in July of 1984, and assessed $3,219.98 as the main office cost related to this delay.[8] For change order ten, he stated the delay occurred in March through June of 1985, and assessed $24,522.75 as the main office cost related to this delay.[9] He found the total indirect or time-related cost of these change orders to be $64,637.47. He testified that in calculating these amounts, he did not use performance, liquidity or activity ratios. He did not prepare these figures to industrial standards because he does not like them.
Schulz testified that he prepared the summary accounting documents used by Myers from O & M's office records. He admitted that the $491.93 per day figure used for the field office cost calculation and the $458.96 per day figure used for the main office cost calculation were based on field office expenses on April 16, 1985 only. He testified that he was involved in several construction related businesses which all used the same office as O & M for their main office. He did not participate in the calculation of indirect cost caused by the change orders but did agree with the amounts assessed by Myers. He felt the contract documents excluded indirect cost from being claimed in change orders. He testified that Smith, in a letter dated April 11, 1984, refused O & M's request for a change order which attempted to recover the indirect cost associated with delay in issuing a prior change order. He said Smith stated O & M's remedy was to sue for these costs.
Smith testified that change orders can award money, days or both. He said that when change orders are signed by all of the parties, they are in agreement with the money and time awarded by the change order and this is the only amount of money they can recover for the change. He stated that his letter of April 11, 1984, was in response to O & M's request for a change order. O & M requested a change order which would have awarded them money for delay by the state in approving a prior change order. Smith rejected this request finding that there was no delay to O & M caused by the approval of the prior change order. His letter stated that O & M's remedy was legal recourse as provided in the contract, i.e., arbitration or suit.[10]
Champagne testified that once a change order grants a contractor money or days and the contractor agrees to the change order, it cannot at a later date claim additional money for the change order work.
The trial court in its reasons for judgment addressed O & M's request for additional days with reference to change orders but did not address O & M's request for indirect cost related to these change orders. Since the trial court did not address this issue, this demand is considered to *1048 have been denied. Soniat v. Whitmer, 141 La. 235, 74 So. 916 (1916); Webster v. Terrebonne Parish Council, 515 So.2d 461 (La.App. 1st Cir.1987), writ denied, 516 So.2d 368 (La.1988); Rills v. Southern Bell Telephone Co., 305 So.2d 596 (La.App. 1st Cir.1974). Apparently, the trial court felt O & M had not proven its entitlement to these damages.
The contract provisions cited above expressly exclude from a change order 1) the cost of the salaries or other compensation of the contractor's personnel at the contractor's principal and branch offices, 2) the expenses of the contractor's principal, branch and field offices and 3) any part of the contractor's capital expenses, including interest on the contractor's capital employed for the work. No other provisions of the contract provide remedies for the cost related to change orders or their delay. Under the clear language of the contract, O & M is not entitled to damages for indirect cost related to change orders six, seven and ten. The trial court was correct in denying this claim.

Conclusion
The trial court found that O & M was not entitled to additional contract days. It also found that O & M was not entitled to damages for indirect cost related to delays caused by change orders six, seven and ten. We have reviewed the record and find the trial court to be correct.
This assignment of error is without merit.

DECREE
For the foregoing reasons, the judgment of the trial court is amended to award O & M an additional $978.07, plus legal interest thereon from the date of judicial demand until paid. In all other respects, the judgment of the trial court is affirmed.[11] O & M is cast for the cost of this appeal.
AMENDED AND AFFIRMED.
NOTES
[1] O & M filed the original petition for damages in this suit on April 11, 1986. On November 3, 1988, in open court by consent of the parties, the original petition was amended to add Odis F. Haymon d/b/a Odis F. Haymon Builder as a party plaintiff. A written amendment to this effect was filed in the record on November 4, 1988.
[2] Although Odis F. Haymon d/b/a Odis F. Haymon Builder was added as a party plaintiff, the trial court judgment only grants relief to O & M. None of the parties have raised this issue on appeal.
[3] The State did not appeal or answer the appeal; therefore, all judgments against it in favor of O & M are final.
[4] The contract between the State and O & M was entered into on July 28, 1983, prior to the 1984 revision of the obligation articles in the Civil Code; therefore, the pre-1984 law of obligations applies to this case. See North Central Utilities, Inc. v. East Columbia Water District, 497 So.2d 326, 330 (La.App. 2nd Cir.1986), writ denied, 501 So.2d 229 (La.1987).
[5] This jurisprudential rule has now been codified in La.C.C. art. 2014.
[6] Also in assignment of error number 4, O & M contends that the State cannot assess liquidated damages because it breached the contract by wrongfully withholding payment to O & M. Even though the State may have breached the contract by failing to pay O & M timely, it is not barred from recovering liquidated damages against O & M for O & M's breach of the contract. O & M recovered interest as damages for late payment by the State. The State is likewise entitled to recover liquidated damages against O & M for its delay in completion of the project.
[7] Because we affirm the trial court's finding that O & M was not entitled to an extension of time on the contract, we need not discuss any damages related to the requested extension of time.
[8] This amount was also the total main office cost attributed to the music school project for June of 1984.
[9] This amount was calculated by taking the total main office cost attributed to the music school project for March through June of 1985 and dividing this amount by 122 days (total delay) and then multiplying this figure by 45 days (change order 10 delay), e.g. $25,780.34 plus $12,455.13 plus $20,724.21 plus $7,524.20 divided by 122 multiplied by 45 equals $24,522.75.
[10] Myers on cross-examination, admitted that his reference to Smith's indication that O & M must sue for indirect cost was in reference to the April 11, 1984 letter. He admitted that this letter was dealing with the State's delay in approving change order two, and O & M's request for money as a result of this delay. He agreed that O & M's remedy for denial of a requested change order was arbitration or suit depending on the amount and admitted that O & M had filed an arbitration proceeding on this issue.
[11] Assignments of error numbers 1 and 2 were not briefed and therefore are considered abandoned. Rule 2-12.4 of the Uniform Rules, Courts of Appeal.